1
2
3
4
5
6
7
8
9
10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13    RYAN COUCH, et al.,                      CASE NO. CV F 08-1621 LJO DLB

14                    Plaintiffs,              ORDER ON DEFENDANTS' F.R.Civ.P. 12(b)(6)
                                               MOTIONS TO DISMISS
15        vs.                                  (Docs. 77, 80.)

16    MATTHEW CATE, et al,

17                    Defendants.
                                          /
18

19                              **INTRODUCTION**

20          Twelve defendant California Department of Corrections and Rehabilitation ("CDC") and Office

21    of Inspector General ("OIG") officials seek F.R.Civ.P. 12(b)(6) dismissal of free speech retaliation, due

22    process and Racketeer-Influenced Corrupt Organizations Act ("RICO") claims of three plaintiff CDC

23    corrections officers on grounds that the claims lack necessary elements and are barred by Eleventh

24    Amendment and qualified immunity.   The plaintiff corrections officers respond that they have

25    sufficiently pled their claims to entitle them to offer evidence to support them.  This Court considered

26    the F.R.Civ.P. 12(b)(6) motions to dismiss on the record and VACATES the February 10, 2009 hearing,

27    pursuant to Local Rule 78-230(h).  For the reasons discussed below, this Court DISMISSES nearly all

28    of the plaintiff corrections officers' claims.

                                           1

# BACKGROUND[1]

## The Parties

Plaintiff Ryan Couch ("Officer Couch") is an eight-year CDC corrections officer who works at CDC's Substance Abuse Treatment Facility ("SATF") in Corcoran. Plaintiff Kenneth Jimenez ("Officer Jimenez") is a ten-year CDC corrections officer at SATF. Plaintiff Barnabe Torres ("Officer Torres") is a 21-year CDC corrections officer at SATF.[2]   At relevant times, plaintiffs had worked in the Investigative Services Unit ("ISU") at SATF as investigative officers.

The FAC names a couple of OIG officials as defendants.[3]   Defendant Matthew Cate ("Secretary Cate") was the California Inspector General until May 2008 and now serves as the CDC Secretary. Defendant David Shaw ("Inspector General Shaw") was OIG's Chief Assistant Inspector General, Bureau of Independent Review, and now serves as the California Inspector General.[4]

Defendant Jeanne Woodford ("Acting Secretary Woodford") has served as the Acting CDC Secretary.   Defendant John Dovey ("Director Dovey") is the CDC Division of Adult Institutions Director.   Defendant Scott Kernan ("Undersecretary Kernan") was the CDC Division of Adult Institutions Director and Deputy Director and now serves as CDC Undersecretary of Operations. Defendant Martin Hoshino ("Assistant Secretary Hoshino") was the CDC Chief of Internal Affairs and now serves as the CDC Assistant Secretary of Internal Affairs.[5]

Defendant Tommy Wan ("Associate Warden Wan") is the Associate Warden in charge of Central Services and Facility C at SATF. Defendant Kimberli Boncore ("Investigator Boncore") has served as

---

[1]     The following factual recitation is derived generally from the First Amended Complaint ("FAC"), which is the subject of defendants' F.R.Civ.P. 12(b)(6) motion.   Numerous material allegations of the FAC are based on "information and belief."

[2]     Officers Couch, Jimenez and Torres will be referred to collectively as "plaintiffs."

[3]     The FAC alleges that OIG is responsible to safeguard the "integrity of California's correctional system" and "was empowered to vet appointees to management positions at CDC, down to the warden level and including all offices held by the CDC Defendants."   The FAC further alleges that OIG officials hold "significant power" over CDC officials.

[4]     Secretary Cate and Inspector General Shaw will be referred to collectively as the "OIG defendants."

[5]     Acting Secretary Woodford, Director Dovey, Undersecretary Kernan and Assistant Secretary Hoshino will be referred to collectively as the "CDC defendants."

1    an investigator and corrections officer at SATF.  Defendant Ralph Diaz ("Associate Warden Diaz") was

2    a Facility C Captain at SATF and now serves as an Associate Warden.  Defendant Kenneth Clark

3    ("Warden Clark") has served as a SATF Warden.  Defendant Kathy Allison ("Chief Deputy Warden

4    Allison") has served as a Chief Deputy Warden of SATF.  Defendant Jack Hutchins ("Chief Deputy

5    Warden Hutchins") was a Chief Deputy Warden of SATF and is now retired.[6]

6                                **Summary Of Plaintiffs' Claims**[7]

7          The FAC stretches 40 pages.  In sum, the FAC alleges that CDC prison management uses

8    "peacekeepers," influential inmates and often gang members, to discipline other inmates in exchange

9    for illegal favors and preferred treatment.  Plaintiffs claim that use of peacekeepers produces threats of

10   and actual injury and death to correctional officers and inmates and that plaintiffs were retaliated against

11   for attempts to prosecute peacekeepers and to prevent peacekeeper violence.  Plaintiffs accuse the SATF

12   defendants of using retaliatory tactics with the CDC and OIG defendants' involvement and complicity

13   to protect defendants from civil and criminal liability associated with peacekeepers.  Plaintiffs allege that

14   defendants' conduct violated plaintiffs' free speech and due process rights and RICO.  Plaintiffs identify

15   defendants wrongful actions to include "demotions and dismissals of Officers Couch and Jimenez,

16   destruction of evidence, failure to take steps to protect Plaintiffs from threats against their lives, and

17   failure to cease the illegal use of peacekeepers."

18         **Inmate Attack And Officer Torres' Fatal Shooting Of An Assailant**

19         Prior to their transfers at issue here, plaintiffs had worked at SATF Facility C, SATF's highest

20   security facility reserved for violent offenders and gang members.  Plaintiffs characterize Facility C as

21   "a high-prestige assignment for an ISU officer at SATF."

22         On May 23, 2006, inmate Ricardo Acosta ("inmate Acosta") was attacked with lethal weapons

23   by two peacekeepers of the Southern Mexicans gang.  Officer Torres saw the attack and shot and killed

24   one of the assailants.  Inmate Acosta survived the attack with serious injuries.

25   _____

26        [6]       Associate Warden Wan, Investigator Boncore, Associate Warden Diaz, Warden Clark, Chief Deputy
     Warden Allison and Chief Deputy Warden Hutchins will be referred to collectively as the "SATF defendants."  The OIG,
     CDC and SATF defendants will be referred to collectively as "defendants."

27

28        [7]       The FAC alleges a litany of misconduct of Associate Warden Wan and to a lesser extent of Investigator
     Boncore.  This Court will focus on the FAC's allegations relating directly to plaintiffs.

                                              3

1    Plaintiffs surmise that Investigator Boncore had "advance knowledge" of a Southern Mexican

2    hit on inmate Acosta but took no action to protect him.

3    The assailant who survived the attack on inmate Acosta recently returned to SATF Facility C and

4    was placed in the housing unit managed by Investigator Boncore.  Plaintiffs characterize the assailant

5    as "a threat to Officer Torres' safety, because he likely holds a grudge against Officer Torres for killing

6    is co-assailant."  Officer Torres was not notified of the assailant's return to SATF.

7    Officer Torres fears for his life and has suffered "tremendous stress" in that Southern Mexican

8    gang members have warned him that the gang contemplates a hit on him.  Officer Torres used 30 days

9    of his vacation time for a leave of absence, paid for mental health care out of pocket, and was transferred

10   to another facility at SATF.

11   **Officer Couch's Transfer To Facility D**

12   Investigator Boncore was put in charge of the investigation of the hit on inmate Acosta.

13   Defendants accuse Investigator Boncore of destroying or suppressing a video tape which depicted

14   Southern Mexican gang leaders' communications to place a hit on inmate Acosta through sign language.

15   A few days after the attack on inmate Acosta, Investigator Boncore "warned Officer Couch to

16   stay away from her investigation, and said that she was not going to do anything with the evidence."  The

17   following week, an announcement was made that Officer Couch was being transferred to SATF's

18   Facility D.  Plaintiffs characterize an assignment to Facility D as a "major demotion" in that "Facility

19   D consists substantially of molesters and has little or no gang activity, providing few opportunities for

20   solving big, career-boosting cases."  Plaintiffs attribute Associate Warden Wan to have ordered or

21   authorized Officer Couch's transfer.  In January 2007, Investigator Boncore told Officer Couch that she

22   used her influence over Associate Warden Wan to initiate the transfer because if Officer Couch

23   continued to pursue a lead on inmate Acosta's attack, he was going to "get us all killed."

24   **Officer Jimenez' Transfer To Facility D**

25   On October 25, 2006, inmate Zavala was murdered by other inmates because he was known as

26   a snitch due to frequent contact with Investigator Boncore.  Assistant Warden Wan assigned Investigator

27   Boncore as the lead investigator on inmate Zavala's murder and in an unusual move, gave her unlimited

28   overtime authority and access to SATF on her days off.  Officer Jimenez informed Associate Warden

4

1   Wan of his concerns that Investigator Boncore's misconduct contributed to inmate Zavala's murder and

2   that she had been overly familiar with another inmate.   Associate Warden Wan requested no

3   documentation regarding Officer Jimenez' concerns.   Shortly thereafter, Officer Jimenez was also

4   transferred to Facility D.  Plaintiffs surmise that since Associate Warden Wan made all ISU personnel

5   decisions, he "gave the order to transfer Officer Jimenez."

6   **Officers Couch And Jimenez' Internal Affairs Complaints**

7       In May 2007, Officer Jimenez complained to a senior Sacramento Internal Affairs investigator

8   about Associate Warden Wan and Investigator Boncore's suppression of evidence and was interviewed

9   by an Internal Affairs special agent.  Officer Couch, who was at the time Officer Jimenez' supervisor,

10   made similar complaints to Internal Affairs in 2007.

11       Associate Warden Wan learned about their Internal Affairs complaints and moved Officer Couch

12   to another ISU position to leave Officer Jimenez without a partner and with the workload of two officers.

13   Officer Jimenez was at the time stationed at Facility D, one of the busiest SATF posts, and his "career

14   and personal life began to suffer as a result of his tremendously increased workload."  Despite Officer

15   Jimenez' multiple requests to his sergeants, Associate Warden Wan refused to assign Officer Jimenez

16   a partner or to provide him training provided to others.  After Officer Jimenez was ultimately assigned

17   a partner, that partner was ordered, on plaintiffs' belief, to work on other assignments and not to assist

18   Officer Jimenez.   Plaintiffs surmise that Associate Warden Wan intended Officer Jimenez to be so

19   overworked that he would quit to retaliate against Officer Jimenez and to cover up use of peacekeepers.

20       In August 2007, Associate Warden Wan summoned Officer Couch into his office and asked:

21   "Do you know who my best friend is?"  Associate Warden Wan identified Ralph Rosado, the boss of

22   Officer Couch's father in the CDC Division of Adult Parole Operations.  Officer Couch understood this

23   to be a threat that Associate Warden Wan "had a long reach within CDC" to influence the employment

24   of Officer Couch's father.

25       Internal Affairs initiated an investigation of Investigator Boncore in response to Officer Couch

26   and Jimenez' complaints.  The investigation was dropped within four or five months "with little or no

27   disciplinary action taken."  Plaintiffs surmise that "no competent, good-faith investigation could have

28   been concluded in only four or five months."

5

1   Plaintiffs claim that Associate Warden Wan influenced the selection of personnel on the Internal
2   Affairs investigation to ensure a "perfunctory" investigation that would implicate neither Associate
3   Warden Wan or Investigator Boncore to protect the Southern Mexican peacekeepers.  Plaintiffs surmise
4   that Warden Clark allows Associate Warden Wan to review all Internal Affairs reports which "come
5   back to the Warden's office," and exercised "his own power" to ensure that Investigator Boncore
6   "received a light penalty or none at all as a result of this investigation."

7   In January 2008, a corrections sergeant warned Officer Couch "no matter what happens, never
8   go outside the unit [ISU]" and further stated that Associate Warden Wan "will never tell you you are in
9   trouble; he will just ruin your career.  What happened to Goodes [a correctional officer fired for filing
10   false travel claims] is an example."  Plaintiffs construe the corrections sergeant's comments as a
11   "warning" that Officer Couch would be retaliated for his Internal Affairs complaints.

12   **Federal Investigation Into Peacekeepers**

13   In spring 2007, Officer Couch received a call from an agent of the Bureau of Alcohol, Tobacco
14   and Firearms ("ATF") to seek assistance to develop a comprehensive investigation and prosecution of
15   La EME, the Mexican Mafia gang.  Associate Warden Wan instructed ISU and Institutional Gang
16   Investigations ("IGI") staff to provide no information about La EME and Southern Mexican gang
17   activity at SATF to federal agents without his prior permission.  Officers Couch and Jimenez interpreted
18   Associate Warden Wan's instruction "as a threat that anyone who provided information to federal agents
19   would be retaliated against."  Plaintiffs surmise that Associate Warden Wan "intended the threat to
20   hinder, delay, or prevent the communication of information relating to the commission of federal
21   offenses."

22   When Officer Couch notified Associate Warden Wan that he intended to involve ATF to
23   interdict a drug shipment to SATF, Associate Warden Wan told Officer Couch not to involve ATF and
24   to devote his attention to other matters.  Officer Couch interpreted Associate Warden Wan's comments
25   as another threat that he would face retaliation if he communicated further information to ATF.

26   **Refusal To Protect Officer Couch**

27   In spring 2007, Officer Couch searched inmate Pinuelas' cell and found more than 100 "kites,"
28   letters written in code to instruct other inmates to take actions, including paying fines, smuggling drugs,

1  and committing assaults and murders.  Associate Warden Diaz instructed Officer Couch to show the

2  kites to inmate Pinuelas to allow him to defend himself.  Plaintiffs surmise that Officer Couch's identity

3  was communicated to inmate Pinuelas to appease him to prevent him from attacking CDC staff and that

4  Associate Warden Wan instructed Associate Warden Diaz to show inmate Pinuelas the kites "as a

5  further effort to protect a peacekeeper."  Officer Couch attributes Associate Warden Diaz to have stated

6  at a staff meeting that he was upset that inmate Pinuelas had been "rolled up" because inmate Pinuelas

7  was "keeping the peace."

8           Officer Jimenez recorded inmate Pinuelas on audio tape informing his mother that he and other

9  inmates planned to attack Officer Couch in retaliation.  Officer Couch reported the hit to Investigator

10 Boncore who reported it to Associate Warden Wan.  Plaintiffs accuse Associate Warden Wan and

11 Investigator Boncore of refusing "to initiate a threat assessment or take any other protective action in

12 order to retaliate against Officer Couch."

13                          **Office Couch's Transfer To Facilities A And B**

14          In October 2007, Officer Couch and other corrections officers executed search warrants on

15 Southern Mexican gang members in SATF Facility C and uncovered a large quantity of illegal drugs.

16 In late fall 2007, Officer Couch was transferred to SATF Facilities A and B, and plaintiffs surmise that

17 the transfer was on Associate Warden Wan's instruction.  Plaintiffs characterize a Facilities A and B

18 posting as a demotion in that "there is very little crime on those lower-security facilities."

19          At Facilities A and B, Officer Couch was assigned to "validate" a gang for recognition by CDC

20 although he had no experience doing so and was not part of IGI.  Plaintiffs surmise that Associate

21 Warden Wan demoted Officer Couch and assigned him to a task for which he was not qualified or suited

22 to retaliate against his complaints about protection of Southern Mexican gang members.

23                          **Officer Jimenez' Removal From ISU**

24          Plaintiffs contend that in late 2007, Associate Warden Wan found a pretext to remove in

25 retaliation Officer Jimenez from ISU.  In May 2007, Officer Jimenez had arrested inmate Dearing's

26 mother for smuggling methamphetamines.  After inmate Dearing's mother was hospitalized, inmate

27 Dearing became suicidal.  Officer Jimenez allowed inmate Dearing to telephone his mother on a CDC

28 cellular phone, which is permitted under CDC policy.

1    Inmate Dearing later filed a false complaint against Officer Jimenez that Officer Jimenez offered

2    phone calls to inmate Dearing in exchange for information, a violation of CDC policy.  Inmate Dearing

3    further falsely accused Officer Jimenez of falsifying an inmate disciplinary report.  Plaintiffs surmise

4    that as a result of inmate Dearing's complaints, Associate Warden Wan "ordered Officer Jimenez kicked

5    out of ISU."

6    Two ISU sergeants physically escorted Officer Jimenez out of the building with only a brief

7    opportunity to collect his personal effects.  Officer Jimenez was not provided a ride to SATF's West

8    Entrance gate as customary.

9    There was no investigation of inmate Dearing's charges against Officer Jimenez, and inmate

10   Dearing admitted to making up the charges.

11   Plaintiffs characterize removal from an ISU position as "particularly damaging" because "ISU

12   stints generally last at least two years, and premature removal sends a signal that an officer was

13   incompetent or corrupt."

14   ### Officer Couch's Removal From ISU

15   Plaintiffs claim that Officer Couch was removed from ISU on pretextual grounds.  In January

16   2008, Officer Couch and his partner suspected that drugs were smuggled into SATF in a delivery truck.

17   With their superiors' permission, they inspected a security tower to place a surveillance video camera.

18   Plaintiffs surmise that several days later and without warning, Associate Warden Wan ordered Officer

19   Couch and his partner dismissed from ISU "for failure to inform the chain of command regarding the

20   tower inspection."  Plaintiffs further surmise that "the tower incident was a pretext for the dismissal,

21   which Defendant Wan actually ordered in retaliation against Officer Couch for blowing the whistle on

22   the protection of peacekeepers."

23   As a result of their removals from ISU, Officers Couch and Jimenez were demoted from

24   investigative officer to housing officer.  Plaintiffs consider the job change a demotion in that

25   investigative officers solve crimes and housing officers "spend a significant amount of their time

26   performing menial tasks such as distributing toilet paper and other necessities to inmates."

27   Plaintiffs claim that on future job applications they will need to answer affirmatively that they

28   have been dismissed from a position to insinuate that they are "dirty" due to ISU's special nature.

8

**Officer Jimenez' Denial Of Sergeant Position At Another Prison**

Officer Jimenez was recently denied a sergeant's position at Avenal Prison although he has high test scores and little or no negative information in his personnel file. The Custody Captain who conducted part of the interview at Avenal Prison informed Officer Jimenez that he interviewed well but was denied the position because "there were some issues" at ISU. Plaintiffs surmise that the Custody Captain contacted ISU staff who recommended not to consider Officer Jimenez "to intimidate and harass him for his efforts to expose the illegal use of peacekeepers by the SATF Defendants."

**Recent Charges Against Officer Jimenez**

In October 2008, Officer Jimenez was informed that he was charged with inappropriate contact with an inmate. Plaintiffs characterize the charges as "groundless" and surmise that the SATF defendants fabricated the charges and initiated an investigation to retaliate against Officer Jimenez "for his actions to prevent the use of peacekeepers and for filing this lawsuit." Plaintiffs surmise that because a Warden or Chief Deputy Warden must authorize investigations of SATF staff, Warden Clark or Warden Allison "authorized or knew of this investigation and its flimsiness." Plaintiffs further surmise that Warden Allison "added several false accusations to the investigation, including charges of insubordination and bribing inmates with visitor allowances."

Plaintiffs claim that they have been informed that "a similarly groundless retaliatory investigation of Officer Couch is in progress."

**Alleged Injuries**

Plaintiffs allege the following injuries attributable to the SATF defendants:

1. Physical and emotional distress;

2. Lost opportunities for overtime work, seniority, transfers to other positions and advancement within CDC; and

3. Impeded ability to seek other employment.

Officers Couch and Jimenez further claim:

1. Demotions and tarnished personal and professional reputations; and

2. "Free" work hours due to "the tremendous workload imposed on them."

/ / /

9

## Alleged Pattern Of Retaliation, Threats And Intimidation

To address its RICO claim, the FAC alleges that the incidents at SATF "evince a pattern and practice of illegal currying of favor with peacekeepers followed by retaliatory harassment, threats, evidence suppression, and witness tampering . . . aimed at covering up the culpability of CDC and OIG employees who promoted the use of peacekeepers" and further "evince a conspiracy to cover up the use of peacekeepers and SATF Defendants' culpability."

In the FAC, plaintiffs surmise that:

1.    A "decision by management-level personnel at a prison to protect peacekeepers and thereby jeopardize the safety of prisoners and staff would not be made without the involvement in or acceptance of that decision by CDC and OIG management, including the OIG Defendants and CDC Defendants, in part because of the substantial risk of liability and harm to inmates and staff";

2.    "[R]etaliation of the sort suffered by the SATF Plaintiffs – including demotions – would not have been carried out by management-level personnel at a prison independently and would have involved CDC and OIG management, including the OIG Defendants and CDC Defendants, in part because of substantial risk of litigation";

3.    "[A]ccusations of misconduct such as those lodged by Plaintiffs would have been communicated to CDC and OIG management, in part because of the substantial risk of liability, and would have been acted on but for a conspiracy among all Defendants to protect peacekeepers";

4.    "[M]anagement-level personnel at a prison would have sought authorization for peacekeeper-related misconduct up the chain of command, including but not limited to authorization from the Director of Corrections, the CDC Secretary, the Inspector General, and senior management within the headquarters offices of CDC and OIG"; and

5.    The "CDC and OIG Defendants are motivated to conspire with penal facility management and staff, including the SATF Defendants, in order to protect themselves from civil and potentially criminal liability for their peace-keeper related misconduct";

6.    "Such coordinated efforts to protect peacekeepers across multiple CDC facilities would

10

1    . . . require involvement of the upper echelons of CDC and OIG management, including

2    at a minimum the offices held by Defendants"; and

3    7.    Defendants are and have been engaged in "a pattern and practice of retaliating against

4    Plaintiffs for speaking out about the illegal use of peacekeepers" and "a conspiracy to

5    cover up that they knew about, condoned, permitted, supported, failed to properly

6    investigate, and failed to stop the illegal use of peacekeepers."

7    **Plaintiffs' Claims**

8    In the FAC, Officers Couch and Jimenez pursue:

9    1.    A (first) 42 U.S.C. § 1983 ("section 1983") cause of action that defendants retaliated

10    against Officers Couch and Jimenez' First Amendment protected communications about

11    peacekeepers, filing of Internal Affairs complaints, and related communications; and

12    2.    A (second) section 1983 due process cause of action that defendants deprived Officer

13    Couch and Jimenez' "protected property interest in their employment, including . . .

14    rights to their positions, to their salaries, to opportunities for overtime work and pay, to

15    opportunities for advancement, and other attendant rights of their jobs."

16    All three plaintiffs pursue a (third) RICO cause of action that defendants, by condoning and failing to

17    stop peacekeepers, "conspired and associated with an enterprise whose activities affect interstate

18    commerce, and participated in the conduct of such enterprise's affairs through a pattern of racketeering

19    activity, which injured Plaintiffs in their business or property."

20    The FAC seeks compensatory, special, treble and punitive damages, declaratory and injunctive

21    relief, and attorney fees.

22    **DISCUSSION**

23    **F.R.Civ.P. 12(b)(6) Motion Standards**

24    Defendants seek F.R.Civ.P. 12(b) dismissal of plaintiffs' claims as lacking necessary elements

25    and as barred by Eleventh Amendment and qualified immunities.  A F.R.Civ.P. 12(b)(6) motion to

26    dismiss is a challenge to the sufficiency of the pleadings set forth in the complaint. "When a federal

27    court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or

28    admissions, its task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheurer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974); *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). A F.R.Civ.P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995). F.R.Civ.P. 12(b)(6) dismissal is proper when "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102 (1957).

In resolving a F.R.Civ.P. 12(b)(6) motion, the court must: (1) construe the complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-338 (9th Cir. 1996). Nonetheless, a court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation omitted). A court need not permit an attempt to amend a complaint if "it determines that the pleading could not possibly be cured by allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-1965 (2007) (internal citations omitted).

With these standards in mind, this Court turns to defendants' challenges to the FAC.

### Eleventh Amendment Immunity

Defendants contend that the Eleventh Amendment prevents plaintiffs' recovery of monetary damages subject to payment by the state treasury. Plaintiffs respond that they seek recovery for "harms . . . not prohibited by the Eleventh Amendment."

According to the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United

States by Citizens of Another State, or by Citizens or Subjects of any Foreign State." The United States

Supreme Court has noted: "The [Eleventh] Amendment . . . enacts a sovereign immunity from suit,

rather than a nonwaivable limit on the federal judiciary's subject matter jurisdiction." *Idaho v. Couer

d'Alene Tribe*, 521 U.S. 261, 117 S.Ct. 2028, 2033 (1997).

"The Eleventh Amendment prohibits federal courts from hearing suits brought against an

unconsenting state. Though its language might suggest otherwise, the Eleventh Amendment has long

been construed to extend to suits brought against a state by its own citizens, as well as by citizens of

other states." *Brooks v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1053 (9th Cir. 1991), *cert.

denied*, 503 U.S. 938 (1992) (citation omitted); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44,

116 S.Ct. 1114, 1122 (1996); *Puerto Rico Aqueduct Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139,

144, 113 S.Ct. 684 (1993); *Austin v. State Indus. Ins. Sys.*, 939 F.2d 676, 677 (9th Cir. 1991).

The Eleventh Amendment bars suits against state agencies as well as those where the state itself

is named as a defendant. *See Puerto Rico Aqueduct*, 506 U.S. at 144, 113 S.Ct. 684; *Natural Resources

Defense Council v. California Dept. of Transportation*, 96 F.3d 420, 421 (9th Cir. 1996); *Brooks*, 951

F.2d at 1053; *see also Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995) (per curiam)

(Board of Corrections is agency entitled to immunity); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

(Nevada Department of Prisons was a state agency entitled to Eleventh Amendment immunity).

"Obviously, state officials literally are persons. But a suit against a state official in his or her

official capacity is not a suit against the official but rather is a suit against the official's office." *Will v.

Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304 (1989). Defendants point out that an

action against a state official in his/her official capacity is not an action against the state if it seeks

prospective injunctive relief rather than a compensatory remedy which would deplete public funds. *See

Ex Parte Young*, 209 U.S. 123, 159-160, 28 S.Ct. 441 (1908). Nonetheless, defendant note limits to *Ex

Parte Young*'s exception to the Eleventh Amendment:  "Remedies designed to end a continuing

violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that

law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh

Amendment." *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) (citation

omitted).

Although a plaintiff may pursue compensatory damages from a state official in his/her individual capacity, "[r]elief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant. This is true if the relief is expressly denominated as damages. . . . It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else." *Papasan v. Allain,* 478 U.S. 265, 278, 106 S.Ct. 2932 (1986) (citations omitted).

Defendants direct this Court to look to "the substance of the relief sought":

> For Eleventh Amendment purposes, the line between permitted and prohibited suits will often be indistinct: "[T]he difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." . . . In discerning on which side of the line a particular case falls, we look to the substance rather than to the form of the relief sought . . . and will be guided by the policies underlying the decision in *Ex parte Young.*

*Papasan,* 478 U.S. at 278-279, 106 S.Ct. 2932.

The Ninth Circuit Court of Appeals has succinctly explained: "Generally, the Eleventh Amendment shields state governments from money judgments in federal courts, and from declaratory judgments against the state governments that would have the practical effect of requiring the state treasury to pay money to claimants." *Taylor v. Westly,* 402 F.3d 924, 929-930 (9th Cir. 2005).

Defendants argue that plaintiffs' claims for "past" lost opportunities for overtime, seniority, transfers to other positions and advancement in CDC are barred by Eleventh Amendment sovereign immunity in that they are unique state employment benefits which are paid "out of the state treasury." Defendants note such benefits involve contributions to the state Public Employees Retirement System to require state treasury calculations. Defendants conclude that suing defendants in their individual capacities "is not dispositive" given that the practical effect of a damages award against defendants "would require the state treasury to pay money and benefits to plaintiffs."

Plaintiffs contend that defendants misconstrue "what Plaintiffs seek" in that plaintiffs do not seek back pay but "harm done to their <u>future</u> employment prospects." (Underlining in original.) Plaintiffs further note that they seek to recover monetary damages based on defendants "individual capacities." Plaintiffs argue that they seek damages for "physical and psychological stress and injuries, for impeded ability to seek other employment, and for demotion and tarnished reputation."

1    The gist of plaintiffs' targeted damages claims is that plaintiffs are prevented to advance from

2    their current housing officer positions.  Plaintiffs appear to claim that had they remained investigative

3    officers, they would have had increased opportunities for higher pay and advancement.  Although proof

4    of such damages remains undetermined, this Court is not prepared to conclude that the claims require

5    resort to state retirement and state treasury calculations, especially given defendants' concession that

6    claims for prospective injunctive relief survive Eleventh Amendment immunity.  Defendants' Eleventh

7    Amendment immunity defense is clever but insufficient to overcome plaintiffs' targeted damages claims.

8                                    **First Amendment Retaliation**

9           Defendants, other than Associate Warden Wan, fault Officers Couch and Jimenez' First

10   Amendment retaliation claims for failure to identify defendants' personal involvement in deprivation

11   of free speech and cognizable adverse action attributable to them.  Officers Couch and Jimenez respond

12   that their First Amendment retaliation claims survive in that: (1) Investigator Boncore, Associate

13   Warden Diaz, Warden Clark and Chief Deputy Warden Allison "personally engaged in actionable

14   conduct"; (2) the CDC defendants are liable as supervisors for the actions of Associate Warden Wan,

15   Investigator Boncore and Associate Warden Diaz; and (3) all defendants "conspired" with Associate

16   Warden Wan.

17          The First Amendment prohibits "direct limits on individual speech" and "adverse governmental

18   action against an individual in retaliation for the exercise of protected speech activities."  *Keenan v.*

19   *Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)); *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1994).

20          As the parties note, to establish a section 1983 First Amendment retaliation claim, a plaintiff

21   employee must demonstrate that: (1) he/she engaged in protected speech; (2) the employer took adverse

22   employment action against the plaintiff employee; and (3) the plaintiff employee's speech was a

23   "substantial or motivating" factor for the adverse employment action.  *Coszalter v. City of Salem*, 320

24   F.3d 968, 973 (9th Cir. 2003).  "A government entity has broader discretion to restrict speech when it acts

25   in its role as employer, but the restrictions it imposes must be directed at speech that has some potential

26   to affect the entity's operations."  *Garcetti v. Ceballos*, __ U.S. __, 126 S.Ct. 1951, 1958 (2006).

27                                  ***Adverse Employment Action***

28          Defendants focus on the second adverse employment element of Officers Couch and Jimenez'

First Amendment retaliation claims.  Defendants note that the gist of Officers Couch and Jimenez'

claims of adverse employment action is their transfers to "a less desirable position within SATF."  The

first line of defense of defendants, other than Associate Warden Wan, is that they lacked "personal"

participation in the transfers.

"A plaintiff must allege facts, not simply conclusions, that show that an individual was

personally involved in the deprivation of his civil rights.  Liability under § 1983 must be based on the

personal involvement of the defendant."  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998),

*cert. denied*, 525 U.S. 1154, 119 S.Ct. 1058 (1999).  Generally, supervisory personnel are not liable

under section 1983 for actions of their employees under a respondeat superior theory, and thus, when

a named defendant holds a supervisory position, the causal link between him and the claimed

constitutional violation must be specifically alleged and proved.  *See Fayle v. Stapley*, 607 F.2d 858, 862

(9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978), *cert. denied*, 442 U.S. 941, 99

S.Ct. 2883 (1979).  To establish a prima facie case of supervisory liability, a plaintiff must show facts

to indicate that the supervisory defendant either: (1) personally participated in the alleged deprivation

of constitutional rights; (2) knew of the violations and failed to act to prevent them; or (3) promulgated

or implemented a policy "so deficient that the policy itself 'is a repudiation of constitutional rights' and

is 'the moving force of the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989);

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Larez v. City of Los Angeles*, 946 F.2d 630,

646 (9th Cir. 1991) (ratification, poor investigation, or failure to terminate series of events may make

supervisor liable).

The Ninth Circuit has explained that "[w]hen a government employee exercises his protected

right of free expression, the government cannot use the employment relationship as a means to retaliate

for that expression":

> The precise nature of the retaliation is not critical to the inquiry in First
> Amendment retaliation cases. The goal is to prevent, or redress, actions by a government
> employer that "chill the exercise of protected" First Amendment rights. *See Rutan v.
> Republican Party*, 497 U.S. 62, 73, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (protection
> of political belief and association under the First Amendment). Various kinds of
> employment actions may have an impermissible chilling effect. Depending on the
> circumstances, even minor acts of retaliation can infringe on an employee's First
> Amendment rights. *See id.* at 75-76, 110 S.Ct. 2729.

1
        To constitute an adverse employment action, a government act of retaliation need
2
not be severe and it need not be of a certain kind. Nor does it matter whether an act of
retaliation is in the form of the removal of a benefit or the imposition of a burden.

3  *Coszalter*, 320 F.3d at 974-975 (adverse employment actions include reassignment to a different

4  employment position, banishment from meetings and training, subjection to investigation and adverse

5  employment report).

6          The relevant inquiry is whether the state had taken "action designed to retaliate against and chill

7  political expression" or, stated another way, whether "the exercise of the first amendment rights was

8  deterred" by the government employer's action.  *Coszalter*, 320 F.3d at 975 (citations omitted.)  "[A]n

9  action is cognizable as an adverse employment action if it is reasonably likely to deter employees from

10  engaging in protected activity."  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000).  Proper inquiry

11  is "whether an official's acts would chill or silence a person of ordinary firmness from future First

12  Amendment activities."  *Mendocino Envir. Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir.

13  1999).

14          "[D]amage to reputation is not actionable under § 1983 unless it is accompanied by 'some more

15  tangible interests,' " and such limitation "cannot be avoided by alleging that defamation by a public

16  official occurred in retaliation for the exercise of a First Amendment right."  *Patton v. County of Kings*,

17  857 F.2d 1379, 1381 (9th Cir.1988).

18          With these First Amendment retaliation standards in mind, this Court turns to the FAC's

19  allegations against defendants.[8]

20          As to Investigator Boncore, Associate Warden Diaz, Warden Clark and Chief Deputy Allison,

21  Officers Couch and Jimenez point to FAC allegations that:

22          1.     Investigator Boncore: (a) admitted to Officer Couch that she used her influence over

23                Associate Warden Wan to initiate Officer Couch's transfer to SATF Facility D to stymie

24                Officer Couch's investigation into inmate Pinuelas; (b) reported to Associate Warden

25                Wan Officer Couch's placement of inmate Pinuelas in administrative segregation to

26                result in Associate Warden Wan's castigation of Officer Couch; and (c) failed to initiate

27

28         [8]   Associate Warden Wan does not seek F.R.Civ.P. 12(b)(6) dismissal of the First Amendment retaliation
claims against him.

a threat assessment or take protective steps despite inmate Pinuelas' threat on Officer Couch's life;

2.   Associate Warden Diaz: (a) instructed Officer Couch to show kites to inmate Pinuelas to suggest to inmate Pinuelas that Officer Couch had found the kites; and (b) stated at a staff meeting that he was upset that inmate Pinuelas had been "rolled up" because inmate Pinuelas was "keeping the peace";

3.   Warden Clark or Warden Allison authorized or knew of an investigation of charges that Officer Jimenez engaged in inappropriate conduct with an inmate and that the investigation was flimsy; and

4.   Warden Allison added false accusations to the investigation, including charges of insubordination and bribing inmates with visitor allowances.

Investigator Boncore notes that she lacks supervisory authority to transfer Officers Couch and Jimenez.  Associate Warden Diaz points to limited allegations that he: (a) decided with Associate Warden Wan to keep Officer Couch away from an investigation; (b) disliked the presence of federal agents; (c) was upset that inmate Pinuelas had been placed in administrative segregation; (d) instructed Officer Couch to show inmate Pinuelas evidence; and (e) said Officers Couch and Jimenez were removed for doing their own investigations.  Warden Clark notes limited allegations that he allowed Associate Warden Wan to review internal investigations, knew of an investigation, and was in Associate Warden Wan's chain of command.  Chief Deputy Warden Allison notes limited allegations which identify him and that he is generally responsible of CDC actions.

Turning to CDC managers, Officers Couch and Jimenez claim that Secretary Tate, the CDC defendants, Warden Clark, Chief Deputy Warden Allison, and Chief Deputy Warden Hutchins, due to their management positions, "were aware of, played a role in, and acquiesced in violating" Officer Couch and Jimenez' constitutional rights.  According to Officers Couch and Jimenez, a "code of silence" prevents their pleading "more than the plentiful facts they have provided."  Defendants note limited allegations which identify the CDC defendants and Chief Deputy Warden Hutchins, who was in Associate Warden Wan's chain of command, and that they are generally responsible for CDC actions.  Defendants further note the absence of allegations of the OIG defendants' meaningful participation in

1    alleged constitutional deprivations given that alleged wrongdoing occurred at SATF, where the OIG

2    defendants are neither policy makers nor direct supervisors, and there are no facts that the OIG

3    defendants were present at SATF or communicated with other defendants. Moreover, defendants point

4    to the limited allegation that Inspector General Shaw met with Associate Warden Wan to discuss

5    exposure to liability for peacekeeper activities and to suggest Associate Warden Wan to retire.

6         Despite its litany of allegations and suppositions, the FAC's chief and essentially sole target of

7    First Amendment retaliation is Associate Warden Wan.  The FAC lacks sufficient facts that defendants,

8    other than Associate Warden Wan, were personally involved in retaliation to chill Officer Couch and

9    Jimenez' First Amendment rights.  Of key importance, the FAC alleges as adverse action that Officers

10   Couch and Jimenez were transferred from investigative officers to housing officers.  The FAC offers

11   unsubstantiated conclusions that defendants, other than Associate Warden Wan, were involved in the

12   transfers based in part or solely on their positions within CDC or OIG.  The FAC lacks sufficient factual

13   allegations to link the supervisory defendants to an alleged constitutional violation.

14        Moreover, the FAC reveals that Investigator Boncore was not an employer of or supervisor over

15   Officers Couch and Jimenez to impose liability on her for First Amendment retaliation.  This Court

16   surmises that Officers Couch and Jimenez burden this Court and defendants with a verbose FAC filled

17   with suppositions to camouflage the absence of meaningful First Amendment retaliation claims against

18   defendants other than Associate Warden Wan.  Furthermore, the FAC and plaintiffs' opposition (page

19   8, lines 1-16) reveal that Officers Couch and Jimenez continue to address the peacekeepers issue to

20   reflect an absence of chilling effect.

21        Another death blow to Officer Couch and Jimenez' First Amendment retaliation claim is the

22   failure to allege cognizable adverse action attributable to defendants other than Associate Warden Wan

23   in that they remain corrections officers.  The California Court of Appeal has explained "classes" of state

24   civil service, such as a corrections officer:

25        Appointments and promotions in the "civil service," as relevant to the case at bench, are
         to "classes" of the civil service – not to "steps" within salary ranges. As used in the laws
26        and rules governing the civil service, the terms "position," "class," "appointment,"
         "salary," "salary range," "step," "rate," "promotion" and "demotion," etc., are words of
27        art specifically defined in the California Constitution, the State Civil Service Act and in
         the rules of the State Personnel Board. (See Cal. Const., art. VII, Gov. Code, § 18520 et
28        seq., and see rule 91.)

*Geftakys v. State Personnel Board*, 138 Cal.App.3d 844, 857, 188 Cal.Rptr. 305 (1982).

The FAC alleges at all times that Officers Couch and Jimenez are in the corrections officer class at SATF. Their reference to demotion or dismissal is unsubstantiated hyperbole. *See* Cal. Gov. Code, § 18525.2 ("'Demotion'" means the appointment of an employee to a position in a different class with a lower salary range . . .")

To attempt to resurrect their First Amendment retaliation claims, Officers Couch and Jimenez offer that "<u>all</u> Defendants conspired with Defendant Wan (and each other) to commit and cover up potentially criminal conduct and violations" of Officers Couch and Jimenez' civil rights. Officers Couch and Jimenez claim that the FAC identifies the conspiracy's parties, general purpose, motive, time frame and overt acts. Officer Couch and Jimenez note that the FAC alleges/surmises that:

1. Associate Warden Wan, Investigator Boncore and Associate Warden Diaz met and decided to protect inmate Pinuelas "by ensuring that Officer Couch was kept far from the case";

2. Investigator Boncore told Officer Couch that she had used her influence over Associate Warden Wan to initiate Officer Couch's transfer to SATF Facility D in that if Officer Couch continued to pursue inmate Pinuelas, he was going to "get us all killed";

3. Associate Warden Diaz told an ISU officer that Officers Couch and Jimenez were removed for "doing their own investigations";

4. Warden Clark allows Associate Warden Wan to review Internal Affairs reports and ensured that Investigator Boncore received a light penalty or none at all after an investigation into her;

5. Chief Deputy Warden Allison added false charges of Officer Jimenez' insubordination and bribing inmates with visitor allowances;

6. There is friendship and frequent and unusual contact among defendants; and

7. Defendants participate in a chain of command and decision making.

Again, despite Officer Couch and Jimenez' conspiracy notions, the FAC lacks sufficient factual allegations that defendants, other than Associate Warden Wan, retaliated to chill Officers Couch and

Jimenez' First Amendment rights.  The official positions and alleged conduct of defendants (other than Associate Warden Wan) fail to substantiate First Amendment retaliation given that the FAC focuses on Associate Warden Wan and his conduct to transfer Officer Couch and Jimenez from investigative officers to housing officers.  The FAC fails to link, through a conspiracy or otherwise, that defendants (other than Associate Warden Wan) took action reasonably likely to deter Officer Couch and Jimenez protected activities, especially given the FAC's allegations that they continued to pursue protected activities.  Conspiracy claims are conclusory and speculative.  Officer Couch and Jimenez' conspiracy arguments add nothing.

**Due Process**

Defendants contend that the FAC fails to satisfy elements for a section 1983 claim for deprivation of a property or liberty interest without due process.  Officers Couch and Jimenez respond that they "were dismissed and stigmatized" to deprive them of property and liberty rights.

"The Fourteenth Amendment protects individuals against the deprivation of liberty or property by the government without due process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). A Fourteenth Amendment due process claim under section 1983 may address "procedural rights" of "guarantee of a fair procedure" to address deprivation of a "life, liberty or property" interest "*without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975 (1990).  To state a section 1983 claim based on procedural due process, a plaintiff must allege: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process. *Wright v. Riverland*, 219 F.3d 905, 913 (9th Cir. 2000).

***Property Interest***

A property interest exits in state employment:

"The Fourteenth Amendment to the United States Constitution 'places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of' property "within the meaning of the Due Process Clause."' (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1112 [278 Cal.Rptr. 346, 805 P.2d 300].) "Property interests that are subject to due process protections are not created by the federal Constitution. 'Rather, they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."' ( *Ibid.*) Thus, it has been held, with respect to a state civil service employee of the state Department of General Services, that "California's statutory scheme regulating employment in civil service 'confers upon an individual who achieves the status of "permanent employee" a property interest in the continuation of his [or her]

1    employment which is protected by due process.'" ( *Ibid.*, citing *Skelly v. State Personnel*
     *Bd.* (1975) 15 Cal.3d 194, 206 [124 Cal.Rptr. 14, 539 P.2d 774].) Thus, ". . . a property
2    right in public employment is a creation of state law. [Citation.] The statutory terms that
     define a particular right to employment determine its dimensions and scope." (*Coleman*
3    *v. Department of Personnel Administration, supra,* 52 Cal.3d at p. 1114.)

4    *Bostean v. Los Angeles Unified School Dist.*, 63 Cal.App.4th 95, 108-109, 73 Cal.Rptr.2d 523 (1998).

5          Officers Couch and Jimenez have a property interest in their continued CDC employment.  They

6    argue that they could not be demoted or dismissed without adequate process.  Defendants contend that

7    Officers Couch and Jimenez lack a property interest to avoid transfer to a different corrections officer

8    position.

9          Once it is determined that the Due Process Clause applies, "the question remains what process

10   is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600 (1972).  An essential principle of

11   due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for

12   hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.

13   306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950).  "The fundamental requirement of due process is the

14   opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424

15   U.S. 319, 333, 96 S.Ct. 893 (1976).

16         The FAC identifies as Officers Couch and Jimenez' protected property interests the right to their

17   positions, their salary, opportunities for overtime work and pay and advancement, and attendant job

18   rights.  Officers Couch and Jimenez note that they "were kicked out of ISU, a sought-after position" and

19   assigned to less glamorous positions.  Officers Couch and Jimenez claim that they will have to answer

20   affirmatively the question on state employment applications whether they have been "fired, dismissed,

21   terminated, or had an employment contract terminated from any position for performance or for

22   disciplinary reasons?"  Officers Couch and Jimenez further claim that such response will insinuate  that

23   they were grossly incompetent or "dirty" given ISU's "special nature."

24         Defendants argue that none of Officer Couch and Jimenez' alleged property rights are cognizable

25   under the Fourteenth Amendment.  Defendants criticize the FAC's failure to identify a statute, regulation

26   or ordinance to create a property right "to a specific position with the same salary, opportunities for

27   overtime work and pay, opportunities for advancement and rights attendant to their jobs."  Defendants

28   characterize Officer Couch and Jimenez' alleged property rights as mere expectations which "do not

1   involve a federally cognizable property interest." Defendants note that the FAC identifies only Associate

2   Warden Wan as involved in Officers Couch and Jimenez' transfers.   Defendants argue that Officer

3   Couch and Jimenez' transfers are not adverse employment action to constitute a due process violation.

4        This Court agrees with defendants.   The FAC does not allege deprivation of Officers Couch and

5   Jimenez' property rights in their employment without due process in the absence of allegations of

6   employment termination or constructive discharge.   The FAC merely alleges the Officers Couch and

7   Jimenez were transferred from investigative officers to housing officers.   At most, the FAC alleges the

8   positions are different in their duties, not in their pay, opportunities for promotion, and similar benefits.

9   *See Stiesberg v. State of California*, 80 F.3d 353, 357 (9th Cir. 1996) (highway patrol officer's claim is

10  an unrecoverable "unilateral expectation" in absence of allegations "that he had a right not to be

11  transferred or subjected to petty annoyances on the job, and/or that the conduct complained of amounted

12  to a constructive demotion or discharge"); *Altman v. Hurst*, 734 F.2d 1240 (7th Cir. 1984) (no property

13  or liberty interest implicated where police sergeant complained of transfer to another post with denial

14  of overtime and rescheduling of vacation).   Officers Couch and Jimenez acknowledge that ISU positions

15  are limited to two years and point to no state law or statutory term to provide them a more glamorous

16  position with "attendant benefits."   Moreover, the FAC and Officers Couch and Jimenez fail to point

17  to what process of which they were deprived.   Officer Couch and Jimenez' claims of conspiracy fail to

18  demonstrate deprivation of property interests.   Officer Jimenez' claims of a physical escort from ISU

19  and lack of a ride to a particular gate are trivial.

20                                  ***Liberty Interest***

21       Officers Couch and Jimenez claim that retaliation against them deprived them of "liberty rights

22  without due process."   Defendants fault the FAC's absence of sufficient facts of a violation of such

23  interest without due process.   Defendants point out the FAC's failure "to identify any state law or

24  regulation that creates the liberty interest they allege was violated."

25       "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the

26  word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies."

27  *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384 (2005).   Defendants note that a state-created

28  liberty interest exists only when a state law or regulation contains substantive limits on official discretion

1  and explicit mandatory language.  *See Mendoza v. Blodgett*, 960 F.2d 1425, 1431-1432 (9th Cir. 1992),

2  *cert. denied*, 506 U.S. 1071, 113 S.Ct. 1027 (1993).

3       Officers Couch and Jimenez claim liberty interests arising from California whistleblower laws.

4  Officers Couch and Jimenez point to California Government Code section 8547.3(a), which provides:

5
> An employee may not directly or indirectly use or attempt to use the official
6
> authority or influence of the employee for the purpose of intimidating, threatening,
> coercing, commanding, or attempting to intimidate, threaten, coerce, or command any
> person for the purpose of interfering with the rights conferred pursuant to this article
7
> [reporting governmental corruption].

8  Officers Couch and Jimenez further rely on California Labor Code section 1102.5(a), which provides:

9
> An employer may not make, adopt, or enforce any rule, regulation, or policy
> preventing an employee from disclosing information to a government or law enforcement
10
> agency, where the employee has reasonable cause to believe that the information
> discloses a violation of state or federal statute, or a violation or noncompliance with a
11
> state or federal rule or regulation.

12       Officer Couch further claims a liberty interest in "a threat assessment" pertaining to inmate

13  Pinuelas' threat after the discovery of kites in his cell in that CDC policy limits discretion to withhold

14  threat assessments.  Officer Couch points to 8 Cal. Code Regs. § 3203(a)(3) which requires employers

15  to maintain an effective Injury and Illness Prevention Program, including "a system for communicating

16  with employees in a form readily understandable by all affected employees on matters relating to

17  occupational safety and health."

18       Officers Couch and Jimenez cite no pertinent authority that whistleblower statutes or a threat

19  assessment give rise to a liberty interest under the facts alleged in the FAC.

20       Officers Couch and Jimenez further claim that "the litany of acts" that deprived them of First

21  Amendment Rights "gave rise to a Due Process liberty interest claim."  However, Officers Couch and

22  Jimenez' failed First Amendment claims are not restored as liberty interest claims.

23       Officers Couch and Jimenez claim that their transfers to housing officer positions stigmatized

24  them to impugn their reputations "without opportunity for notice and a hearing" to clear their names.

25  Officers Couch and Jimenez claim that they were "dismissed" for pretexts of offering inmates favors

26  in return for information, falsifying disciplinary records, and failing to inform the chain of command.

27       The FAC merely alleges they have been transferred to another portion of SATF which they find

28  less desirable.  "An individual has a liberty interest in employment protected by the Due Process Clause

1  if the [personnel action] is for reasons that might seriously damage his standing in the community, or

2  if [it] effectively precludes future work in the individual's chosen profession." *Merritt v. Mackey*, 827

3  F.2d 1368, 1373 (9th Cir. 1987).  The FAC lacks allegations that Officers Couch and Jimenez' standing

4  in the community was damaged or that they were precluded to pursue their corrections officer

5  profession.  Officers Couch and Jimenez attempt to create a liberty interest where there is none.  Their

6  (second) section 1983 due process cause of action fails.

7  <u>**Qualified Immunity For Due Process Claims**</u>

8  Defendants contend that qualified immunity bars Officers Couch and Jimenez' due process

9  claims in that even if Officers Couch and Jimenez' collateral employment benefits are constitutionally

10  protected, the right to such benefits was not clearly established at the time of their alleged deprivation.

11  Officers Couch and Jimenez respond that their "property rights to continued employment free of

12  demotion or dismissal without due process were clearly established" to avoid a qualified immunity bar.

13  Qualified immunity is a defense to claims against governmental officials "arising out of the

14  performance of their duties.  Its purpose is to permit such officials conscientiously to undertake their

15  responsibilities without fear that they will be held liable in damages for actions that appear reasonable

16  at the time, but are later held to violate statutory or constitutional rights." *Kraus v. Pierce County*, 793

17  F.2d 1105, 1108 (9th Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571 (1987).  Qualified immunity

18  protects section 1983 defendants "from liability for civil damages insofar as their conduct does not

19  violate clearly established statutory or constitutional rights of which a reasonable person would have

20  known." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004).  The "heart of qualified

21  immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the

22  case.  Instead, the threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be

23  is true, any allegedly violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir.

24  1995).  "The contours of the right must be sufficiently clear that a reasonable official would understand

25  that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034

26  (1987).

27  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."

28  *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).  The privilege is "an immunity from suit

25

rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806. Courts stress "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534 (1991). "Immunity ordinarily should be decided by the court long before trial." *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991). To analyze qualified immunity, a court determines: (1) what right has been violated; (2) whether that right was so "clearly established" at the time of the incident that a reasonable officer would have been aware of its constitutionality; and (3) whether a reasonable public officer could have believed that the alleged conduct was lawful. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998), *cert. denied*, 525 U.S. 1016, 119 S.Ct. 540 (1988).[9]

Defendants note the absence of FAC allegations that Officers Couch and Jimenez were deprived of employment and the "open question" whether ancillary employment benefits, such as accrued sick leave and medical benefits on termination, are constitutionally protected property rights. *Portman*, 995 F.2d at 906. Defendants note that Officers Couch and Jimenez' transfers from ISU are not demotions or dismissals. As such, defendants argue that Officers Couch and Jimenez' "right to their continued employment within particular facilities at SATF was not clearly established." Defendants further

---

[9]    In *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001), the United States Supreme Court explained:

A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . .

If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

. . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

contend there is no clearly established right to continued overtime shifts and opportunity for advancement.   As to no threat assessment for Officer Couch, defendants note the absence of a liberty interest and settled law to apprise defendants of such a clearly established right.   Defendants conclude that the "state of the law" at the time of the alleged deprivations was not such that defendants would have known that their conduct violated Officers Couch and Jimenez' constitutional rights.

Officers Couch and Jimenez note that they ground their claims on the "right to be free of <u>actual</u> demotion or dismissal" contrary to their state employment.  (Underlining in original.)  Officers Couch and Jimenez claim that their liberty interest rights were "clearly established" under California whistleblower protection laws and that their "rights to be free of stigmatizing demotion or dismissal were similarly well-established."

Officers Couch and Jimenez appear to rest their qualified immunity opposition on identity of what they characterize as clearly established rights.  Officers Couch and Jimenez avoid whether the FAC alleges that each defendant violated a clearly established right.  A key problem for Officers Couch and Jimenez is that they fail to establish satisfactory FAC allegations that defendants violated a clearly established due process right.  Despite Officers Couch and Jimenez' hyperbole, the essence of their claims is that Associate Warden Wan transferred them to positions at SATF which they found less desirable than their ISU positions.  Again, Officers Couch and Jimenez point to no relevant authority to create a right to continued employment in a position they deem worthy for themselves.  Officers Couch and Jimenez alleged "no transfer" right is unsupported as is Officer Couch's purported threat assessment right.[10]   Under the FAC's allegations, this Court concludes that defendants could have believed reasonably that their alleged conduct was lawful given the alleged due process rights which Officers Couch and Jimenez seek to champion.  Qualified immunity bolsters dismissal of Officer Couch and Jimenez' due process claims.

## **RICO**

Defendants fault the FAC's RICO claim for failure to satisfy RICO elements.  Plaintiffs respond that the FAC alleges RICO elements in that:

---

[10]     In fact, Officer Couch's transfer from ISU can be construed to protect him from a threat.

1          1.       Defendants "together as individuals" and with prison gangs constitute a RICO enterprise;

2          2.       As CDC and OIG officials, defendants conducted their affairs through these enterprises;

3          3.       Defendants committed RICO predicate acts, including obstructing justice; and

4          4.       Defendants injured plaintiffs in their business or property by interfering with plaintiffs'

5                  employment rights.

6      18 U.S.C. § 1962 ("section 1962") provides"

              (b) It shall be unlawful for any person through a pattern of racketeering activity
7   or through collection of an unlawful debt to acquire or maintain, directly or indirectly,
8   any interest in or control of any enterprise which is engaged in, or the activities of which
      affect, interstate or foreign commerce.
9

              (c) It shall be unlawful for any person employed by or associated with any
10  enterprise engaged in, or the activities of which affect, interstate or foreign commerce,
      to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs
11  through a pattern of racketeering activity or collection of unlawful debt.

12    A violation of § 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of

13  racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim."

14  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275 (1985).  A "plaintiff only has standing

15  if, and can only recover to the extent that, he has been injured in his business or property by the conduct

16  constituting the violation."  *Sedima*, 473 U.S. at 496, 105 S.Ct. 3275.

17                     ***RICO Enterprise***

18    Defendants fault the FAC's failure to allege an "enterprise" among them which affects

19  commerce.  Plaintiffs respond that the FAC alleges four RICO enterprises, comprising CDC, OIG, an

20  association-in-fact of the individual defendants, and the prison gangs with whom the CDC defendants

21  "interact in connection with illegal peacekeeper activities."

22    For a RICO claim, an alleged "enterprise" requires an independent legal entity such as a

23  corporation or an "association in fact" of individuals. 18 U.S.C. § 1961(4).  The United States Supreme

24  Court has explained:

              The enterprise is an entity, for present purposes a group of persons associated together
25  for a common purpose of engaging in a course of conduct. The pattern of racketeering
26  activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C.
      § 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing
27  organization, formal or informal, and by evidence that the various associates function as
      a continuing unit. The latter is proved by evidence of the requisite number of acts of
28  racketeering committed by the participants in the enterprise. While the proof used to

establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved . . .

*United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524 (1981).

Defendants fault the FAC's allegation that SATF is an enterprise affecting interstate commerce as failing to allege an enterprise among defendants in that the OIG and CDC defendants are not alleged to work at SATF. Defendants continue that the SATF defendants' presence at SATF does not constitute a RICO enterprise. "The mere fact that a defendant works for a legitimate enterprise and commits racketeering acts while on the business premises does not establish that the affairs of the enterprise have been conducted through a pattern of racketeering activity." *Roche v. E.F. Hutton & Co., Inc.*, 658 F.Supp. 315, 318-319 (M.D. Pa. 1986).

Defendants further argue that the FAC's allegations regarding Associate Warden Wan and Investigator Boncore's interactions address a supervisor-subordinate relationship, not "an enterprise designed for the common purpose of engaging in a course of conduct." Defendants point to limited allegations that Associate Warden Diaz told an ISU officer that Officers Couch and Jimenez were removed from ISU for doing their own investigations, was Associate Warden Wan's close friend, and was instructed by Associate Warden Wan to show an inmate evidence. Defendants note the limited allegations that the CDC defendants are high level CDC officials and/or within Officer Couch and Jimenez' chain of command. Defendants further note the absence of allegations to connect Warden Clark, Chief Deputy Warden Allison and Chief Deputy Warden Hutchins to a RICO enterprise.

Plaintiffs respond that CDC and OIG are formal legal entities to constitute a RICO enterprise. A "governmental entity may constitute an 'enterprise' within the meaning of RICO." *United States v. Freeman*, 6 F.3d 586, 597 (9th Cir. 1993), *cert. denied*, 511 U.S. 1077, 114 S.Ct. 1661 (1994). Plaintiffs point out that employees of a government agency enterprise are inherently "associated with" the agency under section 1962(c) and violate RICO when they commit racketeering acts through the agency. Plaintiffs note that an enterprise need only minimal impact on interstate commerce. The RICO jurisdictional requirement "is satisfied by proof of a probable or potential impact" on interstate commerce. *United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996), *cert. denied*, 519 U.S. 1156,

1   117 S.Ct. 1096 (1997).

2       Plaintiffs argue that defendants, collectively, are an association-in-fact enterprise. An associated-

3   in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a

4   course of conduct." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524.  To establish such an enterprise, a

5   plaintiff must provide "evidence of an ongoing organization, formal or informal," and "evidence that

6   the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524.

7       Plaintiffs assert that defendants had a "common purpose" of "covering up peacekeeper-related

8   drug-smuggling, gang violence, and civil rights violations that they participated in and suborned by

9   obstructing justice." Plaintiffs identify the ongoing organization as the "management structure and chain

10  of command" at CDC, OIG and SATF.  Plaintiffs claim that racketeering is ongoing since it continued

11  to Officer Couch's January 2008 transfer from ISU.

12      Lastly, plaintiffs argue that the prison gangs with whom the CDC defendants interact in

13  connection with peacekeeper activities are an association-in-fact enterprise given that they are involved

14  in interstate criminal activities and associated with defendants.

15      To establish an enterprise, plaintiffs rely on the FAC's identity of CDC and OIG and defendants

16  positions within CDC and OIG.  The FAC focuses on "the incidents" at SATF, not an ongoing

17  organization.  The FAC does not allege that CDC and OIG are enterprises engaging in conduct through

18  a pattern of racketeering activity.  The FAC alleges that defendants occupy positions within CDC and

19  OIG.  As such, attention turns to whether the FAC sufficiently alleges that defendants are an association-

20  in-fact enterprise.  Again, the FAC focuses on the actions at SATF, not the relationship among

21  defendants other than supervisor-subordinate and chain of command.  The FAC lacks sufficient

22  allegations that defendants function as a continuing unit, especially given that the CDC and OIG

23  defendants were not situated at SATF.  The FAC's reliance on sporadic incidents does not demonstrate

24  that defendants are various associates functioning as a continuing unit.  Moreover, plaintiffs resort to

25  the prison gangs is insufficient in the absence of sufficient allegations of defendant associates

26  functioning as a continuing unit with inmates.  Again, the FAC points to sporadic, isolated incidents of

27  contact between a particular defendant and an inmate.

28  / / /

### *Pattern Of Racketeering Activity*

Defendants fault the FAC's failure to allege that defendants engaged in racketeering activity, let alone a pattern of racketeering activity, given the absence of facts that defendants violated 18 U.S.C. § 1512 regarding obstructing criminal investigations and tampering with witnesses.  Plaintiffs respond that the FAC alleges sufficient obstruction of justice committed by the CDC defendants to satisfy the pattern of racketeering activity element.

"Racketeering activity" is "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . which is chargeable under State law and punishable by imprisonment for more than one year" or any act indictable under several provisions of Title 18 of the United States Code relating to tampering with a witness, victim or informant.  18 U.S.C. § 1961(1); *see Rothman v. Vetter Park Management*, 912 F.2d 315, 316 (9th Cir. 1990).

Subsection (5) of 18 U.S.C. § 1961("section 1961") defines "pattern of racketeering activity" to require "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  Section 1961"does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *H.J., Inc. v. Northwest Bell Telephone Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893 (1989).  Section 1961(5) "says of the phrase 'pattern of racketeering activity' only that it 'requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970,] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.' It thus places an outer limit on the concept of a pattern of racketeering activity that is broad indeed." *H.J, Inc.*, 492 U.S. at 237, 109 S.Ct. 2893.

"Section 1961(5) concerns only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved." *H.J., Inc.*, 492 U.S. at 238, 109 S.Ct. at 2900 (italics in original).  A pattern in not formed by "sporadic activity." *H.J., Inc.*, 492 U.S. at 239, 109 S.Ct. 2900.  The term pattern requires a relationship between predicates and the threat of continuing activity. *H.J., Inc.*, 492 U.S. at 238, 109

S.Ct. at 2900. The factor of continuity plus relationship combines to produce a pattern. *H.J., Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900. "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J, Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900.

Defendants take issue with an alleged violation of 18 U.S.C. § 1512(b), which seeks to punish anyone who " knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to-- (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; [or] (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding . . ." Defendants note the absence of allegations of an "official proceeding" or that defendants intimidated, threatened, corruptly persuaded another, or engaged in misleading conduct to influence or withhold testimony or to alter or destroy an object to be used in an official proceeding.

Plaintiffs point out that RICO predicate acts include obstruction of justice to violate 18 U.S.C. § 1512(b)(3), (c)(1), and (d)(1)-(4). Plaintiffs note that these subsections "prohibit destruction or concealment of evidence and intimidation, harassment, or threats intended to delay or prevent arrests or reporting of federal crimes." Plaintiffs claim defendants violated 18 U.S.C. § 1512 by:

1.     Retaliatory harassment, including Officers Couch and Jimenez' transfers out of ISU;

2.     Investigator Boncore's destruction/suppression of the videotape of inmate Beltran ordering a hit on inmate Acosta and a confession of a confidential inmate informant to conspiring to murder inmate Zavala;

3.     Associate Warden Wan's instruction to prohibit written communication to the Kings County District Attorney's Office regarding investigation in inmate Zavala's murder;

4.      Investigator Boncore's informing Officer Jimenez that she would be responsible to investigate the Southern Mexicans;

5.     Officer Couch's transfer to SATF Facility D after Investigator Boncore told him that she

was not going to do anything with evidence regarding a telephone conversation to order a hit on inmate Acosta;

6.   Cessation of an Internal Affairs investigation of Investigator Boncore and which arose in response to Officers Couch and Jimenez' complaints;

7.   Associate Warden Wan's instruction that Officer Couch to seek IGI permission prior to placing an inmate in administrative segregation;

8.   Associate Warden Wan abandonment of an investigation after a substantial quantity of drugs was found pursuant to execution of a search warrant against Southern Mexicans;

9.   Investigator Boncore's failure to meet her duty to prevent the attack on inmate Acosta but failed to prevent the attack;

10.   Associate Warden Wan and Investigator Boncore's refusal to initiate a threat assessment or to take protective action regarding potential harm to Officer Couch arising from his finding kites in inmate Pinuelas' cell;

11.   Associate Warden Wan's instruction that ISU and IGI not to provide information about La EME and Southern Mexican gang activity to federal agents without his prior permission; and

12.   Associate Warden Wan's telling Officer Couch not to bring in ATF to interdict a drug shipment.

As with their other claims, Associate Warden Wan and to a lesser extent, Investigator Boncore, are the targets of plaintiffs' RICO claims. An alleged pattern of racketeering activity focuses chiefly on Associate Warden Wan. The FAC attempts to swoop up the other defendants in a pattern of racketeering activity by conclusory allegations of a conspiracy and obstruction of justice. The FAC lacks sufficient allegations of an enterprise's conduct through a pattern of racketeering activity. There is an absence of allegations of a relationship of predicates and threat of continuing activity. Plaintiffs' extrapolations of a cover up lack sufficient factual foundation and are premised on conjecture. Plaintiffs through the FAC seek to construe isolated events as a pattern of racketeering activity but lack sufficient foundation to succeed. Moreover, defendants correctly note the absence of allegations to satisfy elements of 18 U.S.C. § 1512(b).

1                                      ***Injury To Business Or Property***

2          Defendants challenge plaintiffs' standing to pursue a civil RICO claim in the absence of an injury

3    to plaintiffs' business or property.  Officers Couch and Jimenez identify as injury to their business or

4    property their removal from ISU and "tarnishing their reputations."  Plaintiffs collectively identify as

5    injury to their business or property their lost seniority, lost opportunities for overtime, transfer and

6    advancement, and interference to seek other employment.

7          A RICO private right of action is reserved for "any person injured in his business or property by

8    reason of a violation of section 1962."  18 U.S.C. § 1964(c).  "To recover under RICO, the individual

9    'must show proof of concrete financial loss' and must demonstrate that the racketeering activity

10   proximately caused the loss."  *Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006) (quoting *Chaset v.

11   Fleer/Skybox Int't,* 300 F.3d 1083, 1087 (9th Cir. 2002)).  "Financial loss alone, however, is insufficient."

12   *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir.), *cert. denied*, __ U.S. __,129 S.Ct.

13   458 (2008) .  "Without a harm to a specific business or property interest – a categorical inquiry typically

14   determined by reference to state law – there is no injury to business or property within the meaning of

15   RICO."  *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1131, 126

16   S.Ct. 1069 (2006).  "[I]njuries to property are not actionable under RICO unless they result in tangible

17   financial loss to the plaintiff."  *Oscar v. University Students Co-op Association*, 965 F.2d 783, 785 (9th

18   Cir. 1992).  Moreover, "personal injuries are not compensable under RICO."  *Oscar*, 965 F.2d at 785.

19   The "ordinary meaning of the phrase 'injured in his business or property' excludes personal injuries,

20   including the pecuniary losses therefrom."  *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988).

21          Defendants contend that the FAC fails to allege a loss of business or property interest outside

22   plaintiffs' CDC employment.  Defendants note the absence of allegations of Officers Couch and

23   Jimenez' denial of CDC employment or change in pay or benefits in that they remained corrections

24   officers although transferred to different SATF facilities.  Defendants argue that alleged lost overtime

25   opportunities and uncompensated extra hours are disconnected from alleged prevention to testify or

26   provide documents regarding peacekeepers.  Defendants further note that Officer Torres "fails to allege

27   any injury to his business or property that was caused by being prevented from testifying, etc."

28   Defendants characterize plaintiffs' alleged loss as financial, not a property deprivation.

                                                    34

1      Officers Couch and Jimenez argue that their removal from ISU constitutes a lost "business

2  opportunity to solve big cases and advance their careers." "Loss of employment, denial of employment

3  benefits, loss of business opportunities, and damage to professional reputation have all been held to

4  constitute cognizable injuries to business or property for purposes of RICO, so long as the injuries were

5  proximately caused by a pattern of racketeering activity." *Guerrero v. Gates*, 110 F.Supp.2d 1287, 1293

6  (C.D. Cal. 2000). However, a RICO plaintiff "may recover only to the extent that he has been injured

7  in his business or property by the conduct constituting the RICO violation" to require a RICO plaintiff

8  to "prove concrete financial losses to recover on his RICO claims, and any damages will be limited to

9  the extent of the tangible financial injury, e.g., lost wages, etc." *Guerrero*, 110 F.Supp.2d at 1293, n.

10  1.

11      Officers Couch and Jimenez fail to demonstrate that lost ISU opportunities and alleged resulting

12  effects, including damage to reputation, constitute injuries proximately caused by a pattern of

13  racketeering activity and tangible financial injuries. "Where the plaintiff alleges each element of the

14  violation, the compensable injury necessarily is the harm proximately caused by the predicate acts that

15  constitute the pattern of racketeering activity, for the essence of the violation is the commission of those

16  acts in connection with the conduct of an enterprise." *Guerrero*, 110 F.Supp.2d at 1292. "[S]peculative

17  'but for' causation is insufficient to state a RICO violation." *Oki Semiconductor Co. v. Wells Fargo*

18  *Bank, Nat. Ass'n,* 298 F.3d 768, 774 (9th Cir. 2002). Officers Couch and Jimenez do not suggest how

19  to measure intangible lost ISU opportunities and resulting effects especially given their continued CDC

20  employment. Moreover, Officer Torres' stress and related effects from his attempt to prevent the attack

21  on inmate Acosta are personal injuries arising from his occupation, not a pattern of racketeering activity.

22  The FAC fails to allege sufficient injuries in plaintiffs' business or property caused by conduct

23  constituting a violation of RICO or 18 U.S.C. § 1512.

24                        **More Definite Statement**

25      The CDC and SATF defendants seek under F.R.Civ.P. 12(e) a more definite statement of

26  plaintiffs' requested injunctive relief. F.R.Civ.P. 12(e) empowers a party to seek "a more definite

27  statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous

28  that the party cannot reasonably prepare a response." The FAC's prayer seeks "injunctive relief

1   according to proof (section 1983 claims only)." The CDC and SATF defendants correctly note that the

2   FAC fails to specify requested injunctive relief.

3       Officers Couch and Jimenez claim that the FAC alleges "sufficient facts of ongoing actionable

4   and illegal activity to warrant injunctive relief" and that purported injunctive relief "will be decided after

5   all of the relevant facts have been collected and presented."

6       Officer Couch and Jimenez appear to concede that the FAC fails to allege sufficiently an

7   injunctive relief claim. Since the FAC is limited to a First Amendment retaliation against Associate

8   Warden Wan, injunctive relief is not readily ascertainable based on what remains from the FAC. As

9   such, granting a more definite statement is unnecessary.

10                              **CONCLUSION AND ORDER**

11      The FAC and plaintiffs' opposition are short of substance and long on extraneous matters,

12  hyperbole and supposition.  The FAC attempts to extrapolate a few pertinent facts and many

13  suppositions into a grand conspiracy and casts a wide net over numerous CDC officials.  The FAC

14  burdens already overburdened public officials, including this Court. Plaintiffs did not request an attempt

15  to amend the FAC, and this Court will not grant an attempt to amend it.  Stretching 40 pages and more

16  than 300 enumerated paragraphs, the FAC reflects apparently all which plaintiffs could conjure up on

17  the alleged matters.  As explained above, a further tortured pleading is unnecessary and would serve no

18  meaningful purpose given plaintiffs' opportunities to attempt to allege claims.

19      For the reasons discussed above, this Court:

20      1.      DISMISSES with prejudice the (first) section 1983 First Amendment retaliation cause

21              of action against all defendants, except Associate Warden Wan;

22      2.      DISMISSES with prejudice the (second) section 1983 due process cause of action and

23              (third) RICO cause of action against all defendants; and

24      3.      DIRECTS the clerk to enter judgment against plaintiffs Ryan Couch, Kenneth Jimenez

25              and Barnabe Torres and in favor of defendants Matthew Cate, David Shaw, Jeanne

26              Woodford, John Dovey, Scott Kernan, Martin Hoshino, Kimberli Boncore, Ralph Diaz,

27              Kenneth Clark, Kathy Allison and Jack Hutchins.

28      IT IS SO ORDERED.

1   **Dated:**    **February 6, 2009**                  **/s/ Lawrence J. O'Neill**

UNITED STATES DISTRICT JUDGE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28