1
2
3
4
5
6
7
8
9
10
11
12

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

13    RYAN COUCH and KENNETH JIMENEZ,      CASE NO. CV F 08-1621 LJO DLB

14               Plaintiffs,         **ORDER ON DEFENDANTS' MOTIONS TO DISMISS SAC** (Doc. 115)

15      vs.

16    TOMMY WAN, KIMBERLI BONACORE, and RALPH DIAZ,

17

18               Defendants.
_____/

19                        **<u>INTRODUCTION</u>**

20          Defendants, officers of the California Department of Corrections and Rehabilitation ("CDC")

21   seek Fed. R. Civ. P. 12(b)(6) dismissal of free speech retaliation and Racketeer-Influenced Corrupt

22   Organizations Act ("RICO") claims asserted against them by plaintiffs Ryan Couch ("Officer Couch")

23   and Kenneth Jimenez ("Officer Jimenez") (collectively "plaintiffs"), also CDC correctional officers.

24   Defendants attack the allegations of plaintiffs' second amended complaint ("SAC") on a number of

25   grounds, most of which were raised against plaintiffs first amended complaint.  Having considered the

26   parties arguments, the appellate court's order to reverse in part this Court's previous order dismissing

27   with prejudice plaintiffs' claims, and the relevant case law, this Court finds that plaintiffs have stated

28   a claim for First Amendment retaliation and RICO.  According, defendants' motion to dismiss is denied.

1

# BACKGROUND[1]

2

## The Parties

3      Officer Couch and Officer Jimenez are CDC correctional officers who worked at CDC's

4 Substance Abuse Treatment Facility ("SATF") in Corcoran.  At relevant times, plaintiffs had worked

5 in the Investigative Services Unit ("ISU") at SATF as investigative officers.  Defendant Tommy Wan

6 ("Associate Warden Wan") is the Associate Warden in charge of Central Services and Facility C at

7 SATF.  Defendant Kimberli Boncore ("Investigator Boncore") has served as an investigator and

8 corrections officer at SATF.  Defendant Ralph Diaz ("Associate Warden Diaz") was a Facility C Captain

9 at SATF and now serves as an Associate Warden.

10

## Summary Of Plaintiffs' Claims

11      The SAC stretches 39 pages.  In sum, the SAC alleges that CDC prison management uses

12 "peacekeepers"–influential inmates who are often gang members–to discipline other inmates in

13 exchange for illegal favors and preferred treatment, including management-condoned drug trafficking

14 and permission to assault other inmates.  Specifically, plaintiffs allege that defendants allowed members

15 of the Southern Mexican gang, known as La EME, to act as peacekeepers, traffic drugs and other

16 contraband in the prison, and carry out attacks other prisoners.  Plaintiffs claim that use of peacekeepers

17 produces threats of and actual injury and death to correctional officers and inmates and that plaintiffs

18 were retaliated against for their attempts to prosecute peacekeepers and to prevent peacekeeper violence.

19 Plaintiffs accuse defendants of using retaliatory tactics as a result of their efforts to report defendants'

20 misconduct related to their use of peacekeepers.  Plaintiffs claim that defendants harassed, threatened,

21 and retaliated against plaintiffs to avoid civil and criminal liability.  Plaintiffs allege that defendants'

22 conduct violated plaintiffs' free speech and RICO.  Plaintiffs identify defendants wrongful actions to

23 include "demotions and dismissals of plaintiffs, destruction of evidence, failure to take steps to protect

24 Plaintiffs from threats against their lives, and failure to cease the illegal use of peacekeepers."

25

## Inmate Attack and Officer Couch's Transfer

26      Plaintiffs worked at SATF Facility C.  Inmate Ricardo Acosta ("inmate Acosta") was attacked

27

28      [1]      The following factual recitation is derived generally from the Second Amended Complaint ("SAC"), which is the subject of defendants' Fed. R. Civ. P. 12(b)(6) motion.

2

with lethal weapons by two peacekeepers of the Southern Mexican gang.  During the attack, one of the assailants was and shot and killed by a correctional officer.  Inmate Acosta survived the attack with serious injuries.

Plaintiffs surmise that Investigator Boncore had advance knowledge of a Southern Mexican hit on inmate Acosta but took no action to protect him.  Plaintiffs claim that Investigator Bonacore watched and had interpreted a videotape of a peacekeeper giving a hand signal to order a "hit" on inmate Acosta prior to the incident.  Officer Couch contends that Investigator Bonacore mishandled evidence of the incidence, because when he asked her about the video recording of the hand signal, she replied, "It doesn't work anymore."  Plaintiffs claim that the videotape was suppressed or destroyed.

After the attack on inmate Acosta, Officer Couch and Investigator Bonacore participated in a joint interview.  Investigator Bonacore refused to allow the interview to be recorded, in violation of CDC policy.  During that interview, Investigator Bonacore made a statement to imply that she had advance knowledge of the attack.

The day after interview, Officer Couch informed ISU Sergeant Tweedy that Investigator Bonacore had advance knowledge of the attack and refused to record the interview.  Sergeant Tweedy told Officer Couch, "It's being handled.  We have trust in her."  Based on his experience, Officer Couch understood this statement to mean that he should not press the issue further, and that he was not required or expect to report suspected misconduct by other officers.

Investigator Bonacore was placed in charge of the investigation of the hit on inmate Acosta.  Approximately two days after the shooting, Officer Couch listened to a phone call in which information about the hit on inmate Acosta was shared.  Officer Couch presented this evidence to approximately 15-20 ISU officers, including defendants.  Defendants met later than day and decided to protect the peacekeeper who had ordered the hit on inmate Acosta, and themselves, by ensuring that Officer Couch was far away from the facility.  Investigator Boncore "warned Officer Couch to stay away from her investigation, and said that she was not going to do anything with the evidence."

The following week, an announcement was made that Officer Couch was being transferred to SATF's Facility D.  Plaintiffs allege that the transfer was a result of the joint decision of the defendants to keep Office Couch away from the investigation.  Plaintiffs characterize an assignment to Facility D

1    as a "major demotion" in that Facility D consists substantially of molesters and has little or no gang

2    activity, providing few opportunities for solving big cases, thereby substantially reducing an officer's

3    ability for promotion or advancement within CDC.

4          Officer Couch complained to Sergeant Tweedy about the transfer.  Sergeant Tweedy replied,

5    "We're not here to pick fights with the mafia," and specifically ordered the ISU team not to investigate

6    certain peacekeepers in Facility C.  In January 2007, Investigator Boncore told Officer Couch that she

7    used her influence over Associate Warden Wan to initiate the transfer because if Officer Couch

8    continued to pursue a lead on inmate Acosta's attack, he was going to "get us all killed."  In September

9    2007, another correctional officer with close dies to Associate Warden Wan and Investigator Bonacore

10    told Officer Couch that defendants were protecting peacekeepers because they "keep the staff safe" and

11    had a "don't attack staff policy."  Officer Couch asserts that his transfer was made in retaliation for his

12    investigation of the attack on inmate Acosta, and for his attempts to report the misconduct of Associate

13    Warden Wan and Investigator Boncore.  In addition, plaintiffs allege that the transfer of Officer Couch

14    was intended to intimidate and harass him so that "he would keep his mouth shut in the future and not

15    report the misconduct" of defendants.

16          **Officer Jimenez' Transfer To Facility D**

17          On October 25, 2006, inmate Zavala was murdered by other inmates.  Inmate Zavala was

18    murdered because he was known as a snitch due to frequent contact with Investigator Boncore, which

19    he failed to conceal adequately.  Assistant Warden Wan assigned Investigator Boncore as the lead

20    investigator on inmate Zavala's murder and in an unusual move, gave her unlimited overtime authority

21    and access to SATF on her days off.

22          The day after the murder, Officer Jimenez informed Sergeant Tweedy and Associate Warden

23    Wan of his concerns that Investigator Boncore's misconduct contributed to inmate Zavala's murder.

24    Officer Jimenez explained that Investigator was overly familiar with inmate Zavala, spending time

25    outside of his cell having one-on-one conversations in areas that were not visible to other guards.

26    Officer Jimenez reminded Sergeant Tweedy that Investigator Bonacore had been disciplined for her

27    over-familiarity with an inmate who was an associate of Zavala.  Associate Warden Wan requested no

28    documentation regarding Officer Jimenez's concerns.

1   Shortly thereafter, Officer Jimenez was also transferred to Facility D.  Plaintiffs surmise that
2   Associate Warden Wan "gave the order to transfer Officer Jimenez."

3   **Officers Couch And Jimenez' Internal Affairs Complaints**

4   Plaintiffs allege that neither Officer Couch nor Officer Jimenez had an official duty to contact
5   Internal Affairs regarding suspected misconduct by other officers at CDC.  "It was clearly understood
6   within ISU that officers were expected not to take complaints about other officers to officials outside
7   their own unit, and Defendant Wan stated on numerous occasions that he would retaliate against those
8   who inform on the ISU unit."  Nevertheless, in May 2007, Officer Jimenez complained to a senior
9   Sacramento Internal Affairs investigator about Associate Warden Wan and Investigator Boncore's
10  suppression of evidence and was interviewed by an Internal Affairs special agent.  Officer Couch, who
11  was at the time Officer Jimenez' supervisor, made similar complaints to Internal Affairs in July 2007.

12  Associate Warden Wan learned about their Internal Affairs complaints.  After a meeting
13  discussing "dissatisfaction with the allegations against [Investigator] Bonacore, it was decided that a
14  process should be used to remove Officers Couch and Jimenez from ISU in such a way that would not
15  look like retaliation."  Associate Warden Wan moved Officer Couch to another ISU position, leaving
16  Officer Jimenez without a partner and with the workload of two officers.  Officer Jimenez was at the
17  time stationed at Facility D, one of the busiest SATF posts, and his "career and personal life began to
18  suffer as a result of his tremendously increased workload."  Plaintiffs surmise that Associate Warden
19  Wan intended Officer Jimenez to be so overworked that he would quit to retaliate against Officer
20  Jimenez and to cover up use of peacekeepers.

21  In August 2007, Associate Warden Wan summoned Officer Couch into his office and asked:
22  "Do you know who my best friend is?"  Associate Warden Wan identified Ralph Rosado, the boss of
23  Officer Couch's father in the CDC Division of Adult Parole Operations.  Officer Couch understood this
24  to be a threat that Associate Warden Wan "had a long reach within CDC" to influence the employment
25  of Officer Couch's father.

26  Internal Affairs initiated an investigation of Investigator Boncore in response to plaintiffs'
27  complaints.  The investigation was dropped within four or five months "with little or no disciplinary
28  action taken."  Plaintiffs surmise that "no competent, good-faith investigation could have been

concluded in only four or five months."

Plaintiffs claim that Associate Warden Wan influenced the selection of personnel on the Internal Affairs investigation to ensure a "perfunctory" investigation that would implicate neither Associate Warden Wan or Investigator Boncore to protect the Southern Mexican peacekeepers. Plaintiffs surmise that Warden Clark allows Associate Warden Wan to review all Internal Affairs reports which "come back to the Warden's office," and exercised "his own power" to ensure that Investigator Boncore "received a light penalty or none at all as a result of this investigation."

In January 2008, a corrections sergeant warned Officer Couch "no matter what happens, never go outside the unit [ISU]" and further stated that Associate Warden Wan "will never tell you you are in trouble; he will just ruin your career.  What happened to Goodes [a correctional officer fired for filing false travel claims] is an example."  Plaintiffs construe the corrections sergeant's comments as a "warning" that Officer Couch would be retaliated for his Internal Affairs complaints.

**Federal Investigation Into Peacekeepers**

In April or May 2007, Officer Couch received a call from an agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF") seeking assistance to develop a comprehensive investigation and prosecution of La EME.  Officer Couch communicated with ATF and FBI officials, providing them with non-confidential information regarding the peacekeepers.  Other CDC officers informed Associate Warden Wan that Officer Couth was communicating with AFT and FBI about peacekeepers.

Federal agents arrived at the SATF to investigate La EME activity.  Associate Warden Diaz expressed to Officer Jimenez that he "didn't like" the federal presence at SATF.  Investigator Bonacore immediately informed Associate Warden Wan when the federal agents arrive.  Thereafter, although he had extensive knowledge on the subject, Associate Warden Wan was unresponsive to the federal agents' questions on the subject of La EME at the SATF.

After the federal agents left, Associate Warden Wan instructed ISU and Institutional Gang Investigations ("IGI") staff to provide no information about La EME activity at SATF to federal agents without his prior permission.  Plaintiffs interpreted Associate Warden Wan's instruction "as a threat that anyone who provided information to federal agents would be retaliated against."  Plaintiffs surmise that Associate Warden Wan "intended the threat to hinder, delay, or prevent the communication of

1  information relating to the commission of federal offenses."

2  Plaintiffs contend that Associate Warden Wan carried out this threat soon thereafter.  In July

3  2007, when Officer Couch notified Associate Warden Wan that he intended to involve ATF to interdict

4  a drug shipment to SATF, Associate Warden Wan told Officer Couch not to involve ATF and to devote

5  his attention to other matters.  Officer Couch interpreted Associate Warden Wan's comments as another

6  threat that he would face retaliation if he communicated further information to ATF.  In addition,

7  Associate Warden Wan forced Officer Couch to concur with a false affidavit related to the drug

8  shipment, which resulted in an increased prison term for a person who was uninvolved in the shipment.

9  **Placing Officer Couch In Danger and Refusal to Protect**

10  In spring 2007, Officer Couch searched a peacekeeper's cell and found more than 100 "kites,"

11  letters written in code to instruct other inmates to take actions, including paying fines, smuggling drugs,

12  and committing assaults and murders.  During an investigation of the incident, Associate Warden Diaz

13  instructed Officer Couch to show the kites to the peacekeeper.  Plaintiffs allege that Officer Couch's

14  identity was communicated to the peacekeeper to appease him and to prevent him from attacking CDC

15  staff.  Plaintiffs contend that Associate Warden Diaz knew that he was putting Officer Couch's life in

16  danger by disclosing his identity to the peacekeeper.

17  Officer Jimenez recorded the peacekeeper on audio tape informing his mother that he and other

18  inmates planned to attack Officer Couch in retaliation for the kite seizure and investigation.  Officer

19  Couch reported the hit to Investigator Boncore who reported it to Associate Warden Wan.  Plaintiffs

20  accuse Associate Warden Wan and Investigator Boncore of refusing "to initiate a threat assessment or

21  take any other protective action in order to retaliate against Officer Couch."

22  **Officer Couch's Transfer To Facilities A And B**

23  In October 2007, Officer Couch and other corrections officers executed search warrants on La

24  EME gang members in SATF Facility C and uncovered a large quantity of illegal drugs.  In late fall

25  2007, Officer Couch was transferred to SATF Facilities A and B.  Plaintiffs allege that the transfer was

26  on Associate Warden Wan's instruction.  Plaintiffs characterize a Facilities A and B posting as a

27  demotion in that "there is very little crime on those lower-security facilities."

28  At Facilities A and B, Officer Couch was assigned to "validate" a gang for recognition by CDC

although he had no experience doing so and was not part of IGI.  Plaintiffs surmise that Associate Warden Wan demoted Officer Couch and assigned him to a task for which he was not qualified or suited to retaliate against his complaints about protection of La EME gang members.

**Officer Jimenez' Removal From ISU**

Plaintiffs contend that in late 2007, Associate Warden Wan found a pretext to remove Officer Jimenez from ISU in retaliation .  As described above, Officer Jimenez was assigned to a post without a partner.  Once a partner was assigned, Associate Warden Wan instructed his partner to work on other tasks and not to assist Officer Jimenez.  In May 2007, Officer Jimenez had arrested the mother of an inmate for smuggling methamphetamines.  After the inmate's mother was hospitalized, the inmate became suicidal.  Officer Jimenez allowed the inmate to telephone his mother on a CDC cellular phone, which is permitted under CDC policy.

Associate Warden Wan took over the investigation of Officer Jimenez.  Soon thereafter, the inmate filed a false complaint against Officer Jimenez which accused Officer Jimenez of offering phone calls to him in exchange for information, a violation of CDC policy.  The inmate further falsely accused Officer Jimenez of falsifying an inmate disciplinary report.

The SAC alleges that as a result of these complaints, Associate Warden Wan "ordered Officer Jimenez kicked out of ISU."  Two ISU sergeants physically escorted Officer Jimenez out of the building with only a brief opportunity to collect his personal effects.  Officer Jimenez was not provided a ride to SATF's West Entrance gate, as was customary.  There was no investigation of the inmate's charges against Officer Jimenez, and the inmate admitted to making up the charges.  Plaintiffs characterize removal from an ISU position as "particularly damaging" because "ISU stints generally last at least two years, and premature removal sends a signal that an officer was incompetent or corrupt."

**Officer Couch's Removal From ISU**

Plaintiffs claim that Officer Couch similarly was removed from ISU on pretextual grounds.  In January 2008, Officer Couch and his partner suspected that drugs were smuggled into SATF in a delivery truck.  With their superiors' permission, they inspected a security tower to place a surveillance video camera.  Several days later and without warning, Associate Warden Wan ordered Officer Couch and his partner dismissed from ISU "for failure to inform the chain of command regarding the tower

inspection."  Plaintiffs surmise that the tower incident was a pretext for the dismissal, which Associate Warden Wan actually ordered in retaliation against Officer Couch for blowing the whistle on the protection of peacekeepers.

As a result of their removals from ISU, Plaintiffs were demoted from investigative officer to housing officer.  Plaintiffs consider the job change a demotion in that investigative officers solve crimes and housing officers "spend a significant amount of their time performing menial tasks such as distributing toilet paper and other necessities to inmates."

Plaintiffs claim that on future job applications they will need to answer affirmatively that they have been dismissed from a position to insinuate that they are "dirty" due to ISU's special nature.

### Officer Jimenez' Denial Of Sergeant Position At Another Prison

Officer Jimenez was denied a sergeant's position at Avenal Prison although he has high test scores and little or no negative information in his personnel file.  The Custody Captain who conducted part of the interview at Avenal Prison informed Officer Jimenez that he interviewed well but was denied the position because "there were some issues" at ISU.  Plaintiffs surmise that the Custody Captain contacted ISU staff who recommended not to consider Officer Jimenez "to intimidate and harass him for his efforts to expose the illegal use of peacekeepers by the SATF Defendants."

### Charges Against Officer Jimenez

In October 2008, Officer Jimenez was informed that he was charged with inappropriate contact with an inmate.  Plaintiffs contend that these allegations are "absolutely false" and surmise that the SATF defendants fabricated the charges and initiated an investigation to retaliate against Officer Jimenez for his actions to prevent the use of peacekeepers and for filing this lawsuit.

### Alleged Injuries

Plaintiffs allege the following injuries attributable to the SATF defendants:

1.      Physical and emotional distress;

2.      Lost opportunities for overtime work, seniority, transfers to other positions and advancement within CDC;

3.      Impeded ability to seek other employment;

4.      Demotions and tarnished personal and professional reputations; and

5.     Unpaid work hours due to "the tremendous workload imposed on them";

6.     Increased threat to their physical safety on the job; and

7.     For Officer Jimenez, the costs associated with his divorce.

### Alleged Pattern Of Retaliation, Threats And Intimidation

To address the RICO claim, the SAC alleges that the incidents at SATF "evidence a pattern and practice of illegal currying of favor with peacekeepers followed by retaliatory harassment, threats, evidence suppression, and witness tampering by Defendants, all aimed at covering up the Defendants' illegal use of peacekeepers and other peacekeeper-related misconduct."

In the SAC, plaintiffs allege that the incidents at SATF constitute violation of RICO, including, but not limited to:

1.     corrupt concealment of records with the intent to impair the records' availability for use in an official proceeding, in contravention of 18 U.S.C. section 1512;

2.     hindering, delaying, preventing, or dissuading Plaintiffs from reporting peacekeeper-related misconduct to a federal law enforcement officer or judge, from attending or testifying in an official proceeding, or from causing a criminal prosecution to be sought, in contravention of 18 U.S.C. section 1512; and

3.     retaliation for communication with law enforcement officers related to the possible commission of a federal offense, in contravention of 18 U.S.C. section 1513.

Plaintiffs assert that "despite numerous complaints, no meaningful disciplinary action has been taken against Defendant Wan, Defendant Boncore, or Defendant Diaz, providing evidence that a conspiracy to suborn and cover up the use of peacekeepers exists at SATF among Defendants."

### Plaintiffs' Claims

In the SAC, Officers Couch and Jimenez pursue:

1.     A (first) 42 U.S.C. § 1983 ("section 1983") cause of action that defendants retaliated against Officers Couch and Jimenez' First Amendment protected communications about peacekeepers, filing of Internal Affairs complaints, and related communications; and

2.     A (second) RICO cause of action that defendants, by condoning and failing to stop peacekeepers, "conspired and associated with an enterprise whose activities affect

10

1    interstate commerce, and participated in the conduct of such enterprise's affairs through

2    a pattern of racketeering activity, which injured Plaintiffs in their business or property."

3  The SAC seeks compensatory, special, treble and punitive damages, declaratory and injunctive relief,

4  and attorney fees.

5  ### Procedural History

6        This action originally named over a dozen defendants, and asserted First Amendment, Due

7  Process, and RICO claims.  A February 6, 2009 order of this Court ("February 6 Order") dismissed most

8  of plaintiffs' claims with prejudice.  This Court entered judgment against plaintiffs on those claims and

9  stayed plaintiffs' remaining claims pending appeal.

10       On May 14, 2010, the United States Court of Appeals for the Ninth Circuit issued an order

11  affirming in part and reversing in part this Court's February 6 order, and remanding the action for further

12  proceedings ("Appellate Order").  In the Appellate Order, the appellate court affirmed this Court's

13  dismissal of plaintiffs' first amendment claims against all defendants except Investigator Bonacore and

14  Associate Warden Diaz.  Plaintiffs' first amendment retaliation claim survived against Associate Warden

15  Wan in the February 6 Order, and was not an issue on appeal.  The Appellate Order held that this Court

16  properly dismissed plaintiffs' due process claim.  As to the RICO claim, the appellate court upheld

17  dismissal against all defendants except Associate Wardens Wan and Diaz and Investigator Boncore.

18       Plaintiffs filed a second amended complaint on July 8, 2010.  On July 28, 2010, defendants

19  moved to dismiss it.  Plaintiffs opposed the motion on August 24, 2010.  Defendants filed a reply on

20  August 30, 2010.  This Court found this motion suitable for a decision without a hearing, vacated the

21  September 7, 2010 hearing pursuant to Local Rule 230(g), and issues the following order.

22  ### DISCUSSION

23  ### Fed. R. Civ. P. 12(b)(6) Motion Standards

24       A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the

25  pleadings set forth in the complaint.  A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either

26  a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

27  theory."  *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion

28  to dismiss for failure to state a claim, the court generally accepts as true the allegations of the complaint,

construes the pleading in the light most favorable to the party opposing the motion, and resolves all

doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129

S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550

U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability,

it 'stops short of the line between possibility and plausibility for entitlement to relief." *Id.* (quoting

*Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (internal citations omitted). Thus, "bare

assertions...amounting to nothing more than a 'formulaic recitation of the elements'...are not entitled to

an assumption of truth." *Iqbal*, 129 S. Ct. at 1951 (quoted in *Moss v. United States Secret Serv*., 2009

U.S. App. LEXIS 15694, *14 (9th Cir. 2009)). A court is "free to ignore legal conclusions, unsupported

conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual

allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation

omitted). Moreover, a court "will dismiss any claim that, even when construed in the light most

favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan

Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint . . . must

contain either direct or inferential allegations respecting all the material elements necessary to sustain

recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969 (quoting *Car

Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

**First Amendment Retaliation**

As set forth above, the Appellate Opinion affirmed this Court's dismissal with prejudice of

12

1  plaintiffs' section 1983 First Amendment claims against all defendants except Investigator Boncore and

2  Associate Warden Diaz.  In addition, the Appellate Opinion noted that plaintiffs' first amendment claim

3  against Associate Warden Wan survived the motion to dismiss.  Plaintiffs' SAC asserts a First

4  Amendment retaliation claim against defendants, Associate Wardens Wan and Diaz, and Investigator

5  Boncore.

6         First Amendment protection for public employees is limited.  As the Supreme Court in stated

7  in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), "when public employees make statements pursuant to their

8  official duties, the employees are not speaking as citizens for First Amendment purposes, and the

9  Constitution does not insulate their communications from employer discipline." *Id*. at 421."A

10 government entity has broader discretion to restrict speech when it acts in its role as employer, but the

11 restrictions it imposes must be directed at speech that has some potential to affect the entity's

12 operations." *Id*. at 418.

13        "To state a First Amendment claim against a public employer, an employee must show: (1) the

14 employee engaged in constitutionally protected speech; (2) the employer took 'adverse employment

15 action' against the employee; and (3) the employee's speech was a 'substantial or motivating factor for

16 the adverse action." *Lakeside-Scott v. Multnomah County*, 5556 F.3d 797, 803 (9th Cir. 2009) (quoting

17 *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007)).  "If the plaintiff makes those showings, then

18 the burden shifts to the defendant to show 'by a preponderance of the evidence that it would have

19 reached the same decision...even in the absence of the [plaintiff's] protected conduct." *Id.*

20        Defendants argue that plaintiffs fail to establish that the speech was protected.  In addition,

21 defendants contend that plaintiffs fail to allege that Investigator Boncore and Associate Warden Diaz

22 personally took adverse employment actions against them.  Accordingly, this Court considers these two

23 elements of this cause of action.

24                                        ***Protected Speech***

25        Whether the speech of public employee is "constitutionally protected" involves two inquiries.

26 First, the Court considers whether the "speech addressed an issue of public concern." *Eng v. Cooley*, 552

27 F.3d 1062, 1070 (9th Cir. 2009).  Second, the Court consider whether "the speech was spoken in a

28 capacity of a private citizen and not a public employee." *Id*.  If the speech addressed an issue of public

concern, and the public employee spoke in the capacity of a public employee, then the speech is protected. *Id.*

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Eng*, 552 F.3d at 1070 ( quoting *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 422 (9th Cir. 1995). But "speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *Id.* (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Id.* (quoting *Johnson,* 48 F.3d at 422).

Considered in a light most favorable to plaintiffs, the speech related to a matter of public concern. "Unlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern." *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004); *see also, Robinson v. York*, 566 F.3d 817, 822-23 (9th Cir. 2009) (internal reports of misconduct within police department was speech on matter of public concern). "[P]roper administration of our prisons generally is undoubtedly of great public interest." *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006). Plaintiffs allege that they voiced their concerns to their supervisors and to internal affairs about Investigator Boncore's advance knowledge of a violent attack on another inmate, and her failure to act; Investigator Boncore's connection with a recently murdered inmate and the perpetrator of that murder; and Assistant Warden Wan's and Investigator Boncore's alleged suppression of evidence and cooperation with peacekeepers. Although defendants characterize plaintiffs' complaints as employee grievances, this Court draws inferences in plaintiffs' favor on a Fed. R. Civ. P. 12(b)(6) motion. Considering plaintiffs' allegations, this Court finds that plaintiffs have pleaded sufficiently that the speech was of public concern.

Next, plaintiffs must plead sufficiently that they spoke in the capacity of a private citizen rather than a public employee. "Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Eng*, 552 F.3d at 1071 (quoting *Posey v. Lake Pend*

*Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (quoting, respectively, *Marable v. Nitchman*, 511 F.3d 924, 932-33 (9th Cir. 2007), and *Freitag v. Ayers*, 468 F.3d 528, 544 (9th Cir. 2006)).  While "the question of the scope and content of a plaintiff's job responsibilities is a question of fact," the "ultimate constitutional significance of the facts as found" is a question of law. *Posey*, 546 F.3d at 1129-30.

The appellate court ruled that to "satisfy this step of the inquiry against a motion to dismiss, Couch and Jimenez would have to plead the official responsibilities of a correctional officer and identify the speech that they made in their capacities as private citizens (i.e., outside their official duties)." Appellate Opinion, p. 3.  The appellate court found that on the face of the first amended complaint, there were "insufficient facts to ascertain the scope of Couch's and Jimenez's official duties as correctional officers and whether they made the various statements in their capacity as private citizens or public employees under *Ceballos*." *Id.*

Defendants fault plaintiffs for failing to allege specific job duties of their positions as correctional officers, and argue that their First Amendment claim fails on this ground.  In addition, defendants request this Court to take judicial notice of the CDC Department Operations Manual ("DOM") section 31140.5, describing the official responsibilities of a correctional officer.  Defendants further submit that correctional officers are "peace officers," and argue that case law establishes the responsibilities of peace officers based on a case discussing the responsibilities of police officers.

Plaintiffs counter that they have pleaded sufficiently that the speech was not pursuant to their official duties.  Plaintiffs admit that their allegation that neither Officer Couch nor Officer Jimenez had an official duty to report the misconduct of other officers is a legal conclusion, but argue that this conclusion is supported by factual allegations.  Plaintiffs argue that under *Iqbal*, they are not required to prove this element at this stage, and need only allege facts that make it plausible.  Plaintiffs oppose defendants' request for judicial notice of the CDC DOM, arguing that this Court cannot take judicial notice of disputed facts contained in the record.

The scope of an employee's official job duties is a "mixed question of fact and law." *Posey*, 546 F.3d at 1129.  The question of a plaintiff's true responsibilities in a job is a question for the fact-finder. In *Ceballos*, the Supreme Court explained:

> The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties of an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

547 U.S. at 424-25.  Moreover, in a motion to dismiss, this Court must accept as true the plaintiffs' allegations related to their job duties.  "In evaluating whether a plaintiff spoke as a private citizen, [the] court must therefore assume the truth of the facts as alleged by the plaintiff with respect to employment responsibilities.  If the allegations demonstrate an official duty to utter the speech as issue, then the speech is unprotected[.]" *Eng*, 552 F.3d at 1071.

Accepting the truth of plaintiffs' allegations, plaintiffs establish that they did not have a duty to make the speech at issue.  Plaintiffs allege that Assistant Warden Wan, their superior with authority over their job performance, repeatedly instructed ISU officers that they were not to report misconduct outside of ISU.  The SAC further alleges facts showing that SATF policy prohibited plaintiffs from investigating misconduct by other correctional officers.  Moreover, the SAC provides multiple allegations that reporting misconduct of other officers was discouraged and punished.  Taken in a light most favorable to plaintiffs, they have established a question of fact as to whether they job responsibilities included a duty to report misconduct of other officers, or concern about goings on at the prison.  Even if this Court were to consider the formal job description in the DOM, defendants cannot establish this question of fact as a matter of law. *See Posey,* 546 F.3d at 1129.  Considering the foregoing, the SAC pleads this factual element sufficiently.

### *Adverse Employment Action*

Plaintiffs must plead that state "took adverse employment action...[and that the] speech was a substantial or motivating factor in the adverse action." Eng, 552 F.3d at 1071.  In addition, plaintiffs must "allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. "When a government employee exercises his protected right of free expression, the government cannot use the employment relationship as a means to retaliate for that expression":

> The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that "chill the exercise of protected" First Amendment rights. *See Rutan v.*

*Republican Party*, 497 U.S. 62, 73, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (protection of political belief and association under the First Amendment). Various kinds of employment actions may have an impermissible chilling effect. Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights. *See id.* at 75-76, 110 S.Ct. 2729.

To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden.

*Coszalter v. City of Salem*, 320 F.3d 968, 974-975 (9th Cir. 2003) (adverse employment actions include reassignment to a different employment position, banishment from meetings and training, subjection to investigation and adverse employment report). Thus, the relevant inquiry is whether the state had taken "action designed to retaliate against and chill political expression" or, stated another way, whether "the exercise of the first amendment rights was deterred" by the government employer's action. *Coszalter*, 320 F.3d at 975 (citations omitted.) "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000). Proper inquiry is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envir. Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Defendants argue that plaintiffs failed to plead sufficient allegations that Assistant Warden Diaz and Investigator Boncore personally took adverse action against them. As to Associate Warden Diaz, defendants contend that there are no allegations suggesting that Associate Warden Diaz took adverse employment action against plaintiffs. Defendants argue that Investigator Boncore is only a correctional officer, not a supervisor with the ability to transfer plaintiffs or take adverse employment action against them. Defendants conclude that because plaintiffs fail to allege allegations that Associate Warden Diaz and Investigator Boncore personally took adverse employment action against them, this claim fails as to these defendants.

"Liability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), *cert. denied*, 525 U.S. 1154 (1999). Accordingly, this Court will consider separately the allegations as to the individual defendants.

As to Investigator Boncore, defendants argue that she was only a correctional officer with no ability to transfer plaintiffs. In the Appellate Opinion, however, the Ninth Circuit found that it was not

17

necessary to Investigator Boncore was supervisor to state a claim against her.  In reversing this Court's

dismissal of plaintiffs' First Amendment claim against Investigator Boncore, the Ninth Circuit ruled:

> Even though Boncore, as a correctional officer, may not herself have the supervisory authority to effect an employment action such as a transfer, Couth and Jimenez's pleading of the facts indicates that Boncore was assigned the lead the ISU, and thus she did have some supervisory authority over the two officers, both of who worked in the ISU.

Appellate Opinion, pp. 4-5.  In the SAC, plaintiffs allege clearly that Investigator Boncore was assigned

as a supervisory of ISU, with supervisory control over plaintiffs.  The SAC further alleges that

Investigator Boncore: participated in the decision with Associate Wardens Wan and Diaz to transfer

Officer Couch to protect a peacekeeper involved in Officer Couch's thwarted investigation; and met with

Associate Wardens Wan and Diaz after plaintiffs complained to Internal Affair, and the three of them

decided to initiate a process to remove plaintiffs from ISU.  Based on these allegations, plaintiffs state

a retaliation claim against Investigator Boncore.

Similarly, plaintiffs state a retaliation claim against Associate Warden Diaz.  The Ninth Circuit

found that plaintiffs' allegations satisfied the adverse action element to state a cognizable claim against

Associate Warden Diaz:

> Couch and Jimenez may also be able to plead facts to support their retaliation claims against Diaz.  Couch and Jimenez allege that Diaz, in contravention of normal policy, instructed Couch to show an accused peacekeeper evidence implicating him in a conspiracy to commit murder, resulting in a threat on Couch's life.  They also allege that Diaz told another officer that Couch and Jimenez were removing for 'doing their own investigations,' which they understood to mean that Associate Wardens Diaz and Wan decided to remove them for prosecuting peacekeepers.  These two potential adverse employment actions, combined with Diaz's statement to Jimenez that he 'didn't like' the presence of federal officers at the prison, with whom Couch and Jimenez were cooperating, constitute a plausible allegation that Diaz personally retaliated against the two officers for their protected speech.

Appellate Opinion, p. 5.  The SAC contains these and additional allegations against Associate Warden

Diaz to satisfy this element.

### Conclusion

Plaintiffs have alleged sufficiently that the speech was protected, and that each defendant took

adverse employment action against them.  Accordingly, plaintiffs have stated a First Amendment

retaliation claim against each defendant.

///

# **RICO**

"RICO provides a private cause of action for "[a]ny person injured in his business or property by reasons of a violation of section 1962 of this chapter." *Hemi Group*, 130 S.Ct. at 987, *quoting* 18 U.S.C. §1964(c).  18 U.S.C. § 1962 ("section 1962") contains RICO's criminal provisions.  Relevant to this motion, section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A violation of section 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  In addition to alleging the elements of the claim, each RICO plaintiff must establish that he or she has standing to bring the claim.  A "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496.  To survive a motion to dismiss, "each of the officers must show that the defendants' conduct was the proximate cause of that injury." Appellate Opinion, p. 10 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). In *Hemi Group*, "the Supreme Court recently clarified that this proximate cause requires 'some direct relation between the injury asserted and the injurious conduct alleged,' and explicitly rejected foreseeability as a standard for determining proximate causation." Appellate Opinion, p. 10 (quoting *Hemi Group*, 130 S.Ct. at 989, 991).

Defendants challenge plaintiffs' RICO claim on a number of grounds.  Defendants argue that plaintiffs lack standing to raise the a RICO claim, because there is no injury to "business or property" and there is no proximate causation.  In addition, defendants contend that plaintiffs fail to allege an "enterprise" and "racketeering activity."  The Court considers first whether plaintiffs allege sufficiently the elements of section 1962(c), then whether they have standing to assert a civil RICO claim.

### *RICO Enterprise*

RICO "protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful...activity is committed.'" *Cedric*

1    *Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164-65 (2001).  A RICO "enterprise" includes "any

2    individual, partnership, corporation, association, or other legal entity, or any union or group of

3    individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4).  Thus, an enterprise may

4    be a legal entity, such as a corporation, or may be "a group of persons associated together for a common

5    purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

6         An associated-in-fact enterprise is "proved by evidence of an ongoing organization, formal or

7    informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S.

8    583; *Odom v. Microsoft Corp*., 486 F.3d 541, 552 (9th Cir.), *cert. denied,* 2007 U.S. Lexis 115900

9    (2007).  An "ongoing organization is a vehicle for the commission of two or more predicate crimes."

10   *Odom*, 486 F.3d at 552 (quotations and citations omitted).  "The continuity requirement does not, in

11   itself, require that every member be involved in each of the underlying acts of racketeering, or that the

12   predicate acts be interrelated in any way." *Id*. at 552-53. (quotations and citations omitted).

13        Defendants fault the SAC for failing to allege an "enterprise" between defendants.  Defendants

14   argue that "[j]ust because defendants...work or did work at SATF does not make them an enterprise

15   under the RICO."  Defendants further argue that plaintiffs fail to allege that the enterprise affected

16   interstate commerce, as there are no allegations of interstate commerce transactions, the use of the phone

17   lines, or transfer of prisoners out of state.  Finally, defendants dismiss plaintiffs allegations that the

18   defendants spent extensive amounts of time together and conspired together as describing "an Associate

19   Warden supervising a correctional officer."

20        Plaintiffs argue that they have alleged sufficiently a number of enterprises.  First, plaintiffs argue

21   that SATF, as a legal entity, qualifies as an enterprise.  Second, plaintiffs contend that defendants

22   constitute an association-in-fact enterprise. Third, plaintiffs contend that defendants and their association

23   with the prison gangs constitute an association-in-fact enterprise.

24        SATF, as a legal entity, qualifies as an enterprise for RICO purposes.  SATF was established by

25   law in 1993. 1993 Cal. Stats. Ch. 585.  Defendants rely on *Roche v. E.F. Hutton & Co., Inc*., 658 F.Supp.

26   315 (M.D. Pa. 1986) for their argument that plaintiffs cannot rely on SATF as the enterprise.

27   Defendants' position fails for two reasons.  First, defendants quote the following language to support

28   their position: "The mere fact that a defendant works for a legitimate enterprise and commits

20

1   racketeering acts while on the business premises does not establish that the affairs of the enterprise have

2   been conducted through a pattern of racketeering activity." 658 F.Supp. at 318-19.  The court went on

3   to explain, however, that to establish that a defendant participated in an enterprise, "it must be shown

4   that the defendant is enabled to commit the predicate offenses solely by virtue of his position in the

5   enterprise or involvement in or control over the affairs of the enterprise; or...the predicate offenses are

6   related to the activities of that enterprise." *Id.* at 319.  In addition, the *Roche* court found that the

7   plaintiffs had stated a claim against the defendant, who was a manager at the alleged "enterprise" and

8   that the manager's place of business qualified as a RICO enterprise. *Id.*  Thus, *Roche* supports plaintiffs'

9   position that SATF qualifies as an enterprise for RICO purposes.  The allegations of the SAC support

10  an interference that defendants were able to commit the predicate offenses by virtue of their positions

11  in SATF and that the predicate offenses were related to defendants' activities at SATF.  Accordingly,

12  plaintiffs have alleged a RICO enterprise.[2]

13                             ***Pattern Of Racketeering Activity***

14          Subsection (5) of 18 U.S.C. § 1961("section 1961") defines "pattern of racketeering activity" to

15  require "at least two acts of racketeering activity, one of which occurred after the effective date of this

16  chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the

17  commission of a prior act of racketeering activity."  Section 1961"does not so much define a pattern of

18  racketeering activity as state a minimum necessary condition for the existence of such a pattern." *H.J.,*

19  *Inc. v. Northwest Bell Telephone Co.*, 492 U.S. 229, 237 (1989).

20          To satisfy this element, plaintiffs must allege sufficient facts that defendants conduct constituted

21  a "pattern."  "Section 1961(5) concerns only the minimum *number* of predicates necessary to establish

22  a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of

23  predicate acts involved." *H.J., Inc.*, 492 U.S. at 238 (italics in original).  A pattern in not formed by

24  "sporadic activity." *Id.* at 239.  The term pattern requires a relationship between predicates and the

25  threat of continuing activity. Id. at 238.  The factor of continuity plus relationship combines to produce

26  a pattern. *Id.* at 239.  "RICO's legislative history reveals Congress' intent that to prove a pattern of

27

28          [2]Because the Court finds that plaintiffs established a legal entity enterprise, the Court need not address whether
defendants were an associated-in-fact enterprise.

1    racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and

2    that they amount to or pose a threat of continued criminal activity." *Id.*

3          In addition, plaintiffs must allege that defendants' conduct was "racketeering activity."

4    "Racketeering activity" is "any act or threat involving murder, kidnapping, gambling, arson, robbery,

5    bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . .

6    . which is chargeable under State law and punishable by imprisonment for more than one year" or any

7    act indictable under several provisions of Title 18 of the United States Code relating to tampering with

8    a witness, victim or informant.  18 U.S.C. § 1961(1); *see Rothman v. Vetter Park Management*, 912 F.2d

9    315, 316 (9th Cir. 1990).

10          Plaintiffs contend that defendants committed multiple RICO predicate acts, including obstruction

11   of justice to violate 18 U.S.C. § 1512(b)(2), and (3), (c)(1), and (2), and (d)(2)-(4).  18 U.S.C. §1512

12   provides, in relevant part:

13        (b) Whoever knowingly uses intimidation, threatens or corruptly persuades another
          person, or attempts to do so, or engages in misleading conduct toward another person,
14        with intent to–

15         (2) cause or induce any person to--
            (A) withhold testimony, or withhold a record, document, or other object, from an
16        official proceeding;
            (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's
17        integrity or availability for use in an official proceeding; or

18         (3) hinder, delay, or prevent the communication to a law enforcement officer or judge
          of the United States of information relating to the commission or possible commission
19        of a Federal offense or a violation of conditions of probation, supervised release, parole,
          or release pending judicial proceedings;
20
          shall be fined under this title or imprisoned not more than 20 years, or both.
21
          (c) Whoever corruptly--
22         (1) alters, destroys, mutilates, or conceals a record, document, or other object, or
          attempts to do so, with the intent to impair the object's integrity or availability for use in
23        an official proceeding; or
           (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to
24        do so,

25        shall be fined under this title or imprisoned not more than 20 years, or both.

26        (d) Whoever intentionally harasses another person and thereby hinders, delays, prevents,
          or dissuades any person from--
27         (2) reporting to a law enforcement officer or judge of the United States the commission
          or possible commission of a Federal offense or a violation of conditions of probation,
28        supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

Plaintiffs note that these subsections "prohibit destruction or concealment of evidence and intimidation, harassment, or threats intended to delay or prevent arrests or reporting of federal crimes."  Plaintiffs claim defendants violated 18 U.S.C. § 1512 by:

1.	Retaliatory harassment, including Officers Couch and Jimenez' transfers out of ISU;

2.	Investigator Boncore's destruction/suppression of the videotape of the peacekeeper ordering a hit on inmate Acosta and a confession of a confidential inmate informant to conspiring to murder inmate Zavala;

3.	Associate Warden Wan's instruction to prohibit written communication to the Kings County District Attorney's Office regarding investigation in inmate Zavala's murder;

4.	Investigator Boncore's informing Officer Jimenez that she would be responsible to investigate the Southern Mexicans;

5.	Officer Couch's transfer to SATF Facility D after Investigator Boncore told him that she was not going to do anything with evidence regarding a telephone conversation to order a hit on inmate Acosta;

6.	Cessation of an Internal Affairs investigation of Investigator Boncore and which arose in response to Officers Couch and Jimenez' complaints;

7.	Associate Warden Wan's instruction that Officer Couch to seek IGI permission prior to placing an inmate in administrative segregation;

8.	Associate Warden Wan abandonment of an investigation after a substantial quantity of drugs was found pursuant to execution of a search warrant against Southern Mexicans;

9.	Investigator Boncore's failure to meet her duty to prevent the attack on inmate Acosta but failed to prevent the attack;

10.	Associate Warden Wan and Investigator Boncore's refusal to initiate a threat assessment or to take protective action regarding potential harm to Officer Couch arising from his

1      finding kites in inmate Pinuelas' cell;

2      11.    Associate Warden Wan's instruction that ISU and IGI not to provide information about

3             La EME and Southern Mexican gang activity to federal agents without his prior

4             permission; and

5      12.    Associate Warden Wan's telling Officer Couch not to bring in ATF to interdict a drug

6             shipment.

7             Considering these allegations, this Court finds that plaintiffs have stated a claim of a pattern of

8      racketeering activity.  The appellate court implied, and this Court agrees, that plaintiffs' allege activity

9      that violated 18 U.S.C. §1512(b)(3).  The transfer of plaintiffs to a different facility, to prevent Officer

10     Couch from pursuing high profile peacekeepers, and to prevent Officer Jimenez from investigating the

11     murder of an inmate, suggests "intimidation" used to "hinder, delay, or prevent the communication to

12     a law enforcement officer...of information relating to the commission or possible commission of a

13     Federal offense." 18 U.S.C. §1512(b)(3).  Considering the two transfers, as well as the other activity

14     alleged, this Court finds sufficient allegations to support a pattern of racketeering activity.

15                                          ***RICO Standing***

16            A RICO private right of action is reserved for "any person injured in his business or property[.]"

17     18 U.S.C. § 1964(c).  This injury requirement is described as an issue of standing. *Sedima*, 472 U.S. at

18     496.  The RICO standing requirement has two components.  First, a plaintiff must allege an injury to his

19     or her "business or property."  *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (en banc), *cert. denied*, 546

20     U.S. 1131, 126 S.Ct. 1069 (2006).  Second, a plaintiff must allege that the injury was proximately caused

21     by the conduct prohibited by the RICO statutes. *Hemi Group, LLC. v. City of New York*, – U.S. –, 130

22     S.Ct. 983 (2010).  Defendants challenge each of these components in this motion.

23                                      *Injury to Business or Property*

24            "To recover under RICO, the individual 'must show proof of concrete financial loss' and must

25     demonstrate that the racketeering activity proximately caused the loss."  *Guerrero v. Gates*, 442 F.3d

26     697, 707 (9th Cir. 2006) (quoting *Chaset v. Fleer/Skybox Int't,* 300 F.3d 1083, 1087 (9th Cir. 2002)).

27     "Financial loss alone, however, is insufficient."  *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969,

28     975 (9th Cir.), *cert. denied*, 129 S.Ct. 458 (2008) .  "Without a harm to a specific business or property

interest – a categorical inquiry typically determined by reference to state law – there is no injury to business or property within the meaning of RICO." *Diaz*, 420 F.3d at 900 (9th Cir. 2005).

Although the appellate court's opinion reversed on the issue of proximate cause, discussed more fully below, the court noted that it "is possible that Couch and Jimenez may not be able to establish the requisite injury under" the en banc decision of *Diaz*.  Appellate Opinion, p. 12, n.5.  The Court further noted that "[a]lthough we recognized in *Diaz* that our decision articulates a more expansive theory of RICO liability for employment-related losses, we expressly noted that our holding did not create unlimited standing for loss of wages." *Id.* (citing *Diaz*, 420 F.3d at 901).   Although raising the issue, the appellate court left "for another day whether Couch and Jimenez allege sufficient injury" to satisfy the RICO standing requirement.  This Court considers this issue now.

Defendants argue that plaintiffs failed to allege harm to a business or property interest. Defendants points out that plaintiffs continued to have gainful employment throughout the relevant time period.  While plaintiffs allege that they were transferred to different facilities and out of the ISU, plaintiffs remained employed in their capacities as correctional officers.  Moreover, defendants point out that plaintiffs failed to allege a change in pay or benefits.  In addition, defendants contend that although plaintiffs allege that they lost opportunities for overtime and were not compensated for extra hours at work, these opportunities are not protected by state law, and are only a financial loss.  Based on these contentions, defendants conclude that plaintiffs have failed to allege an injury to their property or business interests.

Plaintiffs contend that the following injuries constitute harm to their protectable business or property interests:  lost opportunities for overtime work and pay; lost seniority; lost opportunities for transfer to other positions, promotions, and career advancement; unpaid work hours; impeded ability to seek other employment; demotions; and tarnished personal and professional reputations. Plaintiffs argue that lost wages and overtime wages are a protectable property interest in California and that the lost promotions and demotions interfered with plaintiffs' property interest.

Both parties rely on *Guerrero v. Gates*, 442 F.3d 697 (9th Cir. 2006) to support their position. In *Guerrero*, the plaintiff pursued an action against various Los Angeles officials in connection with his arrests, prosecutions, and incarceration. *Id*. at 701.  The plaintiffs asserted a claim under RICO, alleging

injury due to lost employment prospects during his alleged wrongful incarceration. *Id.* at 707.  Relying

on *Diaz*, the Court ruled that the plaintiff pleaded an injury to a business or property interest:

> Guerrero alleged that he was "unable to pursue gainful employment while defending [himself] against unjust charges and/or while unjustly incarcerated" and that he "suffered a material diminishment of [his] employment prospects by virtue of the unjust and unconstitutional conviction[]." Under *Diaz*, Guerrero's alleged harm amounts to intentional interference with contract and interference with prospective business relations, which are torts under California law that constitute injury to business or property under RICO. Therefore, Guerrero adequately pleaded the injury to business or property required to establish standing  under RICO.

*Id.* at 707-08.  Defendants argue that facts under *Guerrero* are "illustrative" and establish that plaintiffs

fail to allege a protectable property interest.  Specifically, defendants argue that in *Guerrero*, the plaintiff

was unable to pursue gainful employment, whereas here, plaintiffs continued to be employed.  Plaintiffs

argue that *Guerrero* supports their position that lost financial opportunity, including a "material

diminishment of [a plaintiff's] employment prospects," constitutes injury under RICO.

   To understand the *Guerrero* ruling, this Court considers *Diaz*, upon which it relied, and the cases

following *Diaz*.   In *Diaz*, the court found that the plaintiff's harm for lost wages due to false

imprisonment alleged harm to a property interest because California law recognizes the torts of

intentional interference with contract and interference with prospective business relations. 420 F.3d at

900.  Since *Diaz*, the Ninth Circuit has followed "*Diaz's* instruction to determine whether the relevant

state's law recognizes the alleged property interest" to determine whether a plaintiff satisfies this RICO

pleading requirement. *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 977 (9th Cir. 2008).  *See,

e.g., Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 364 (9th Cir. 2005)

(plaintiff's claim alleging diminished litigation settlement due to the defendant's fraud alleged injury

to a property interest, because fraudulent inducement is an actionable tort under Hawaii law), *cert.

denied*, 547 U.S. 1102 (2006).  Thus, "[s]tate law typically determines whether a given interest qualifies

as 'property.'" *Thomas v. Baca*, 308 Fed. Appx. 87, 88 (9th Cir. 2009) (quoting *Diaz*, 420 F.3d at 899).

   Plaintiffs erroneously argue that "financial loss is all that RICO liability requires."  As set forth

above, however, "[f]inancial loss alone...is insufficient" to establish RICO injury. *Canyon County*, 519

F.3d at 975.  Nevertheless, in addition to alleging an interest protected by state law, plaintiffs must also

allege a "concrete financial loss, and not mere injury to a valuable intangible property interest." *Oscar

1    *v. Univ. Students Co-Operative Ass'n*, 965 F.2d. 783, 785 (9th Cir. 1992) (en banc).

2           Considering the above authority, this Court finds that plaintiffs state a claim for RICO injuries.

3    Plaintiffs points out that California wage and hour laws protect unpaid wages and overtime.  *See, e.g.*,

4    Cal. Labor Code §§210, 218.5, and 510.   In addition, plaintiffs allegations of lost seniority, lost

5    opportunities for transfer to other positions, promotions, and career advancement, impeded ability to

6    seek other employment and demotions amount to an intentional interference with prospective contractual

7    relations. *See Diaz*, 420 F.3d at 900; *Guerrero*, 442 F.3d at 707.   As in *Guerrero*, the alleged harm

8    amounts to a "material diminishment" of plaintiffs' "employment prospects." *Id*.   Accordingly, these

9    injuries satisfy the RICO injury requirement.

10                                   *Proximate Cause*

11          The Ninth Circuit affirmed this Court's dismissal of plaintiffs' RICO claims against all

12   defendants except Assistant Wardens Wan and Diaz and Investigator Boncore.   As to these defendants,

13   the appellate court ruled:

14          Our de novo analysis indicates that Couch and Jimenez might be able to allege facts
            establishing a direct relation between their injuries and some of the defendants' predicate
15          acts.   For example, the transfer of Couch to a different facility and the allegation that
            Wan, Boncore, and Diaz effected this transfer to prevent him from pursuing high profile
16          peacekeepers suggests a direct relationship between Couch's injury and racketeering
            activity in violation of §1512(b)(3).   Likewise, Jimenez's transfer to a different facility
17          and the allegation that this transfer was in retaliation for his concerns about an
            investigation of the murder of an inmate also suggests a direct relationship between his
18          injury and racketeering activity in violation of §1512(b)(3).

19   Appellate Order, p. 12.  The Ninth Circuit reversed dismissal of these defendants with instructions to

20   grant leave to amend.   Specifically, plaintiffs were granted leave to amend to allege facts to establish

21   proximate cause under *Hemi Group*.

22          In *Hemi Group*, the Supreme Court explained that "to state a claim under civil RICO, the

23   plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury,

24   but was the proximate cause as well.'" 130 S.Ct. at 989 (quoting *Holmes v. Securities Investor*

25   *Protection Corp.*, 503 U.S. 258, 268 (1992). "Proximate cause for RICO purposes...requires some direct

26   relation between the injury asserts and the injurious conduct alleged.  A link that is too remote, purely

27   contingent, or indirect is insufficient." *Id*. (internal citations and quotations omitted).

28          This Court finds that the SAC contains sufficient allegations of proximate cause.  The appellate

                                          27

court noted that plaintiffs "might be able to establish facts establishing a direct relation between their injuries and some of the defendants' predicate acts." Appellate Opinion, p. 12. The Court further pointed out that "plaintiffs have alleged the transfer of Couch to a different facility and the allegation that Wan, Boncore, and Diaz effected this transfer to prevent him from pursuing high profile peacekeepers suggests a direct relationship between Couch's injury and racketeering activity in violation of §1512(b)(3). Likewise, Jimenez's transfer to a different facility and the allegation that this transfer was in retaliation for his concerns about an investigation of the murder of an inmate also suggests a direct relationship between his injury and racketeering activity in violation of §1512(b)(3)." Defendants do not seriously challenge that the alleged racketeering activity–the transfers, for example–have no direct relation to the injury, i.e., the interference with business relations.

For the foregoing reasons, this Court finds that the SAC adequately pleads a civil RICO claim against defendants.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court DENIES defendants' motion to dismiss.

IT IS SO ORDERED.

**Dated:     September 10, 2010                     /s/ Lawrence J. O'Neill**
UNITED STATES DISTRICT JUDGE